In re RELIANCE GROUP HOLDINGS, INC., et al., Debtor.

M. Diane Koken, etc., Plaintiff,

v.

Reliance Group Holdings, Inc., Defendant.

M. Diane Koken, etc., Plaintiff,

v.

Reliance Insurance Company, Defendant.

Bankruptcy No. 01–13404. Adversary Nos. 01–558– KJC, 01–559–KJC.

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 22, 2002.

Hillary C. Steinberg, James M. Matour, Philadelphia, PA, Lorna Schofield, Steven Gross, Carl Micarelli, Leigh Schachter, DeBevoise & Plimpton, New York City, for Debtor.

Lawrence J. Tabas, Philadelphia, PA, Daniel Wheeler, Ann Laupheimer, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Plaintiff.

Barbara Moses, Laurie Dix, Arnold Culkowitz, Thomas Kent, Orrick, Herrington & Sutcliffe, New York City, for Unofficial Unsecured Creditors Committee.

## OPINION

KEVIN J. CAREY, Bankruptcy Judge.

### I. BACKGROUND [1]

#### A. The Parties.

Reliance Group Holdings, Inc. ("RGH" or the "Debtor") is a Delaware corporation that owns all the stock of Reliance Financial Services Corporation ("Reliance Financial"), which, in turn, owns all the stock of Reliance Insurance Company ("RIC"). RIC is a property and casualty insurer organized under the laws of the Commonwealth of Pennsylvania.[2] RIC is domiciled in Pennsylvania and has its principal place of business in New York.[3]

In past years, RGH's largest source of operating income came from RIC, through Reliance Financial.[4] RGH also owns all the stock of Reliance Development Group, Inc., a real estate development company. As the owner of RIC, RGH is an "insurance holding company," subject to the regulatory authority of Pennsylvania pursuant to the Pennsylvania Insurance Holding Company Act, 40 P.S. § 991.1401 et seq.

M. Diane Koken is the Insurance Commissioner of the Commonwealth of Pennsylvania (the "Commissioner"). Pennsylvania law grants to the Commonwealth Court of Pennsylvania (the "Commonwealth Court") original jurisdiction over insurance company insolvencies. 40 P.S. § 221.4(d).[5] By Order of the Commonwealth Court dated May 29, 2001, the Commissioner was appointed Rehabilitator of RIC pursuant to Article V of the Pennsylvania Insurance Department Act, 40 P.S. §§ 221.1–231 ("Article V"). The May 29, 2001 Rehabilitation Order also placed, by its terms, all assets of RIC under the control of the Commissioner and the Commonwealth Court. On October 3, 2001, upon further petition of the Commissioner, the Commonwealth Court entered an order terminating the rehabilitation of RIC, placing RIC into liquidation and appointing the Commissioner as Liquidator, pursuant to Article V.[6]

1. This Opinion constitutes the findings of fact and conclusions of law required by Fed. R.Bankr.P. 7052. This court has jurisdiction over the Remand Motions and the Venue Motions (as defined infra.) pursuant to 28 U.S.C. § 1334, § 1441, § 1452, and § 157(a).

2. Memorandum of Law Supporting Defendant's Motion To Transfer Venue Under 28 U.S.C. § 1412, filed July 2, 2001, p. 3.

3. Id.

4. In the "Debtor's Brief In Opposition To Plaintiff's Motions To Remand And For Abstention And In Support of Debtor's Motions To Transfer Venue," filed October 19, 2001 (the "Debtor's Brief"), the Debtor wrote: "In past years, dividends from RIC through Reliance Financial have been the Debtor's largest (though not its only) source of operating income." Debtor's Brief, p. 4.

5. The Bankruptcy Code, by virtue of § 109(b)(2) and (d), renders domestic insurance companies ineligible for title 11 debtor relief.

6. The Debtor's Notices of Removal of the State Court Actions, the Venue Motions, and Remand Motions refer to the May 29, 2001 Rehabilitation Order. The currently applicable October 3, 2001 Liquidation Order was entered after the notices of removal and motions were filed. In accordance with the applicable statutes, both orders require the Commissioner to "take possession of" and "administer" RIC's assets. See 40 P.S. § 221.15(c) and § 221.20(c). The orders will be referred to jointly herein as the "RIC Orders."

## B. *The State Court Actions.*

### 1. *The Emergency Petition.*

On June 4, 2001, the Commissioner filed an action entitled "Emergency Petition for Preservation of Insurance Policy Assets" in the Commonwealth Court (the "Emergency Petition"). In the Emergency Petition, the Commissioner seeks (among other things) a declaration that RIC's assets include certain insurance policies which provide comprehensive coverage up to an aggregate amount of $125 million to RGH, its subsidiaries and controlled entities, and their respective directors and officers (the "Lloyds Policies"), and the proceeds of those policies.[7] If determined to be assets of RIC, the Lloyds Policies would be subject to the RIC Orders. In the Emergency Petition, the Commissioner alleges that RGH and its officers and directors were planning to use proceeds from the Lloyds Policies, in the approximate amount of $17 million, to settle certain class action litigation.[8] The Commissioner also alleges that the use of the Lloyds Policies' proceeds for the proposed settlement violates the terms of the RIC Orders.

### 2. *The Trust Action.*

On June 11, 2001, the Commissioner filed a Complaint in Equity in the Commonwealth Court (the "Trust Action") asking the court to impose a constructive trust or resulting trust upon $95,651,000 in cash held by the Debtor.[9] The Commissioner argues that the cash is an asset of RIC that was transferred improperly to the Debtor under the "pretext" of pay-

---

7. In the Debtor's Brief, the Lloyds Policies are further described as follows: "The Lloyds Policies provide coverage for director and officer liability, as well as for obligations of the Debtor and its subsidiaries to indemnify for such liability. In addition, the Lloyds Policies also insure against other types of liability, including for errors and omissions." Debtor's Brief, at p. 12.

8. During June through August, 2000, certain creditors and shareholders of RGH filed numerous class action complaints against RGH and certain of its officers and directors in the United States District Court for the Southern District of New York. The class action complaints were consolidated in the Southern District of New York and are now captioned *In re Reliance Group Holdings Securities Litigation,* No. 00–4653 (the "Class Action"). The Class Action alleges, among other things, violations of federal securities law, including, *inter alia,* that certain officers and directors engaged in a scheme to defraud investors and inflate artificially the price of RGH stock and other securities in violation of § 10(b) of the Securities and Exchange Act of 1934. (*See* Notice of Removal, Adv. Pro. 01–559, filed June 29, 2001, at ¶ 2, and "Brief of M. Diane Koken In Support Of Motions For Remand And In Opposition To Defendant's Motions To Transfer," filed October 19, 2001, p. 5 (the "Commissioner's Brief")).

9. The relief requested by the Commissioner in the Trust Action is set forth as follows:

WHEREFORE, the Rehabilitator [now, Liquidator] of Reliance Insurance Company prays that this Court:

1. Declare that the monies held by defendant Reliance Group Holdings, Inc. in the amount of $95,651,000 are held in constructive trust for Reliance Insurance Company,
2. In the alternative, declare that the monies held by defendant Reliance Group Holdings, Inc. are held in a resulting trust;
3. Restrain and enjoin, preliminarily and permanently, defendant Reliance Group Holdings, Inc. from wasting, transferring, selling, concealing, disbursing, assigning, encumbering or otherwise disposing of the $95,651,000, plus accrued interest, held by it;
4. Order that defendant Reliance Group Holdings, Inc. transmit and deliver to the plaintiff, the Rehabilitator of Reliance Insurance Company, the assets of Reliance Insurance Company in the amount of $95,651,000, plus accrued interest[; and]
5. Grant such other and further relief as the Court in the exercise of its equitable powers deems just and proper.

ments due pursuant to the terms of a Tax Allocation Agreement between the Debtor (then known as "Leasco Data Processing Equipment") and RIC dated October 1, 1968 (the "Tax Allocation Agreement").[10] The Debtor, on the other hand, argues that it properly possesses the cash under the Tax Allocation Agreement and any claims RIC has against the Debtor under that same agreement must be treated in accordance with the priorities established by the federal Bankruptcy Code.

## C. The Bankruptcy Filings.

On June 12, 2001, RGH and Reliance Financial filed voluntary chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court"). The cases are being jointly administered by that court.

## D. Removal of the State Court Actions and Pending Motions.

On June 29, 2001, the Debtor removed the Emergency Petition and Trust Action (the "State Court Actions") to this court. The Emergency Petition was removed pursuant to 28 U.S.C. § 1452 and was docketed as adversary number 01–559. The Trust Action was removed pursuant to 28

U.S.C. §§ 1441 and 1452 and was docketed as adversary number 01–558.[11]

On July 2, 2001, the Debtor filed motions for change of venue in both adversary proceedings, seeking to transfer the removed State Court Actions to the New York Bankruptcy Court pursuant to 11 U.S.C. § 1412 (the "Venue Motions").

On July 12, 2001, the Commissioner filed motions for remand and abstention in both adversary proceedings (the "Remand Motions"). Hearings on the Venue Motions and Remand Motions were postponed, pending resolution of the Commissioner's motion to dismiss the Debtor's and Reliance Financial's bankruptcy cases in the New York Bankruptcy Court. On or about September 26, 2001, the Commissioner withdrew her motion to dismiss the chapter 11 cases and other motions pending before the New York Bankruptcy Court.

On October 19, 2001, the parties filed briefs in support of their respective positions on the Venue and Remand Motions. The Commissioner filed a reply brief on November 2, 2001; the Debtor filed its reply brief on November 5, 2001. A hearing to consider the Venue and Remand Motions was held on November 7, 2001, at which the parties presented oral argument.[12]

---

10. The cash in dispute resulted from two payments to RGH: (1) a $45,651,000 tax refund that RGH received from the Internal Revenue Service on April 3, 2000; and (2) a $50,000,000 payment from RIC to RGH on June 23, 2000, for RIC's estimated share of its federal income tax liability under the Tax Allocation Agreement. (Debtor's Brief, p. 9.) In the Commissioner's Brief, she asserted that the cash in possession of RGH had been depleted to $89 million. (Commissioner's Brief, p. 3). RGH asserted that its cash on hand at the time Trust Action was filed was approximately $89 million, and argued that cash that came into its possession after the Trust Action was filed was from sources unrelated to the monies against which the Commissioner

seeks to impose a trust. (Debtor's Brief, p. 12).

11. Actions that are removed pursuant to either 28 U.S.C. § 1441(a) or § 1452(a) are removed to the federal district court for the district in which the actions are pending. 28 U.S.C. § 157(a) provides that each district court may refer to the bankruptcy judges for that district title 11 cases and any proceedings arising under, arising in or related to a title 11 case. This district has done so by its standing Order of July 25, 1984, as amended by the Order of November 8, 1990.

12. Recently, the Debtor requested, and I granted, permission to submit and argue the

For the reasons which follow, the Commissioner's Remand Motions will be granted, in part, as to the Trust Action and denied as to the Emergency Petition. The Debtor's Venue Motions will be granted, in part, as to the Trust Action and granted *in toto* as to the Emergency Petition, which will be transferred to the New York Bankruptcy Court.

## II. DISCUSSION

### A. *Removal.*

The Debtor removed the Emergency Petition and the Trust Action from the Commonwealth Court pursuant to 28 U.S.C. § 1452, which provides, in relevant part:

> **§ 1452 Removal of claims related to bankruptcy cases.**
>
> (a) A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.
>
> (b) The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. . . .

The Trust Action also was removed pursuant to 28 U.S.C. § 1441. Section 1441 concerns the removal of state court actions to federal court generally, and provides, in relevant part, as follows:

**§ 1441 Actions removable generally**

(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

The Commissioner first argues that the State Court Actions are an enforcement of her "police or regulatory power" and cannot be removed under § 1452. Moreover, she argues that § 1452 is the exclusive means for removal of bankruptcy related matters, rendering § 1441 removal of the Trust Action improper. The Debtor responds by arguing that (1) the Commissioner is not acting as a "governmental unit" in her pursuit of the State Court Actions; (2) the State Court Actions do not involve enforcement of a "police or regula-

---

applicability of two decisions issued on November 6, 2001, the day before oral argument on the motions, but of which the parties were, until recently, apparently unaware. The two decisions are: *Superintendent of Ins. for New York, as Liquidator of First Central Ins. Co. v. First Central Fin. Corp. (In re First Central* *Fin. Corp.),* 269 B.R. 481 (Bankr.E.D.N.Y. 2001) and *Ochs v. Simon (In re First Central Fin. Corp.),* 269 B.R. 502 (Bankr.E.D.N.Y. 2001). This oral argument was held on the record by telephone conference on February 13, 2002.

tory power;" and (3) that the Trust Action was also properly removed pursuant to § 1441, an independent basis for removal, which does not contain an exception prohibiting removal of actions to enforce a governmental unit's police or regulatory power.

### 1. Removal of the Emergency Petition under 28 U.S.C. § 1452 was proper.

#### a. The Debtor is a party to the Emergency Petition.

■ The Commissioner's first argument against removal of the Emergency Petition is that the Debtor is not a "party" to the Emergency Petition, since the only named defendant in that action was RIC, and § 1452 permits only "a party" to remove a claim or cause of action.[13] In the Emergency Petition, however, the Commissioner seeks an order "ordering and directing that Reliance Parent [the Debtor and Reliance Financial], its officers, directors, attorneys and agents, as well as Lloyds Un-

derwriters, ... cease any further action to effectuate or consummate any settlement of the class actions that involves the Policies, or any other asset that is, or may be, an asset of Reliance [RIC]."

The Commissioner seeks to affect directly the Debtor's interest in the Lloyds Policies. Therefore, the Debtor is a necessary party pursuant to Fed.R.Civ.P. 19(a)(2)(i) and its joinder is required because it claims an interest in the subject of the Emergency Petition (i.e., the Lloyds Policies) and failure to include the Debtor as a party would impair its ability to protect that interest.[14] *Cf. Steel Valley Auth. v. Union Switch and Signal Div.,* 809 F.2d 1006, 1013–14 (3d Cir.1987), *Spring–Ford Area School Dist. v. Genesis Ins. Co.,* 158 F.Supp.2d 476, 483 (E.D.Pa.2001). This matter was removed pursuant to § 1452; joining the Debtor as a party will not affect this court's jurisdiction.

Because the issue of whether the Debtor is a party to the Emergency Petition

---

**13.** The record contains no explanation of why only RIC was named as a party.

**14.** A "necessary party" is described in Fed.R.Civ.P. 19(a), made applicable to this proceeding pursuant to Fed.R.Bankr.P. 7019. Fed.R.Bankr.P. 7019 provides that:

Rule 19 F.R. Civ. P. applies in adversary proceedings, except that (1) if an entity joined as a party raises the defense that the court lacks jurisdiction over the subject matter and the defense is sustained, the court shall dismiss such entity from the adversary proceedings and (2) if an entity joined as a party properly and timely raises the defense of improper venue, the court shall determine, as provided in 28 U.S.C. § 1412, whether that part of the proceeding involving the joined party shall be transferred to another district, or whether the entire adversary proceeding shall be transferred to another district.

Fed.R.Civ.P. 19 provides in relevant part as follows:

(a) **Persons To Be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party....

The Bankruptcy Rule 7019 limitations do not apply here because the Debtor (i.e., the party being joined) does not argue that this court lacks jurisdiction to hear the Emergency Petition; to the contrary, the Debtor argues that jurisdiction is proper in this court. The Debtor's argument for transfer of venue under § 1412 is considered *infra.*

arises under a federal statute (28 U.S.C. § 1452(a)), I have applied federal law. However, state law also supports the conclusion that the Debtor is a "party" to the Emergency Petition. 42 Pa.C.S.A. § 102 defines a party as a "person who commences or against whom relief is sought in a matter." *See also Guthrie Clinic, Ltd. v. Meyer,* 162 Pa.Cmwlth. 152, 160–61, 638 A.2d 400, 404 (1994) (Corporation that was not named as a defendant in an action was found to be a "party," as defined in the Pennsylvania Judicial Code, 42 Pa.C.S.A. § 102, and was permitted to appeal a trial court order that had "an immediate and direct effect on the substantial interests of [the corporation].") The outcome of the Emergency Petition will surely will have an immediate and direct effect upon the Debtor.

Accordingly, the Debtor is a "party" and has standing to remove the Emergency Petition.

> b. *The Commissioner is not enforcing a "police or regulatory power."*

■ The Commissioner also argues that the Debtor cannot remove the Emergency Petition under § 1452 because this action falls within the exception to removal contained in § 1452 for "a civil action by a governmental unit to enforce such governmental unit's police or regulatory power." The Debtor responds by arguing that the Commissioner is not acting as a "governmental unit" in bringing the Emergency Petition and that the Emergency Petition is not an enforcement of any "police or regulatory power."

The Third Circuit Court of Appeals has considered the meaning of the phrase "governmental unit's police or regulatory power" in the context of Bankruptcy Code § 362(b)(4), which contains similar language, excepting from the automatic stay "the commencement or continuation of an action or proceeding by a governmental unit... to enforce such governmental unit's or organization's police and regulatory power." [15] In *Penn Terra Ltd. v. Dep't of Envtl. Res.,* 733 F.2d 267 (3d Cir.1984), the court held that the "police or regulatory power" exception should be construed broadly, and reasoned as follows:

> Given the general rule that preemption is not favored, and the fact that, in restoring power to the States, Congress intentionally used such a broad term as "police and regulatory powers," we find that the exception to the automatic stay provision contained in subsections 362(b)(4)-(5) should itself be construed broadly, and no unnatural efforts be made to limit its scope.... Where important state law or general equitable principles protect some public interest, they should not be overridden by federal legislation unless they are inconsistent with explicit congressional intent such that the supremacy clause mandates their supersession.

*Penn Terra,* 733 F.2d at 273. In *Penn Terra,* the Commonwealth sought to force the debtor to rectify environmental haz-

---

15. Section 362(b)(4) states as follows:
 (b) The filing of a petition under section 301 [Voluntary cases], 302 [Joint cases], or 303 [Involuntary cases] of this title, ... does not operate as a stay—
 ...
 (4) under paragraph (1), (2), (3) or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ...to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's ...police or regulatory power.

ards. The court noted that "No more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined. Indeed, both the Senate and House committee reports on the Bankruptcy Reform Act explicitly acknowledge environmental protection as part of the State's police power." *Id.*[16]

The Third Circuit refined its analysis of the phrase "police or regulatory power" in *University Medical Ctr. v. Sullivan (In re University Medical Ctr.)*, 973 F.2d 1065 (3d Cir.1992) in a matter that did not involve an obvious police power, such as environmental protection, but, instead, involved withholding of Medicare reimbursements by the U.S. Department of Health and Human Services. The court determined that the § 362(b)(4) exception for police or regulatory power applied "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety or similar police or regulatory laws, or attempting to fix damages for violation of such law." *University Medical Ctr.*, 973 F.2d at 1075. In a footnote, the court recognized that the legislative history of § 362(b)(4)

> draws a distinction between two types of police or regulatory action: "(1) actions in which the government seeks to protect public health, safety, and welfare, and (2) actions in which the government seeks to protect a pecuniary interest." ... Section 362(b)(4) exempts only the former from the automatic stay.... An action to protect a pecuniary interest has been defined as "one which directly conflicts with the bankruptcy court's control of that property."

16. *See also In re Rabzak,* 79 B.R. 966, 968 (Bankr.E.D.Pa.1987)(Twardowski, J.) (Bankruptcy court found that a debtor could not remove a summons matter to enforce a township ordinance prohibiting the dumping of

*Id.,* n. 11 (citations omitted). The court concluded that the government's withholding of Medicare payments due to the debtor for post-petition services fell within that definition of actions to protect a pecuniary interest. *Id.* The Third Circuit's definition of an action to protect a pecuniary interest set forth in *University Medical Center* was gleaned from the Eighth Circuit's decision *U.S. v. Commonwealth Cos., Inc. (In re Commonwealth Cos., Inc.)*, 913 F.2d 518 (8th Cir.1990). The Eighth Circuit explained that the pecuniary interest test is more specifically one to determine whether an action would result in a pecuniary advantage to the government *vis a vis* other creditors of the debtor's estate. *Commonwealth Cos.,* 913 F.2d at 523.

While the *Penn Terra* and *University Medical Center* decisions consider the language of the police and regulatory power in the automatic stay context, rather than in the removal context, the language of the two statutes is virtually identical, and the purpose behind each exception is the same: to leave the states, for certain purposes, unfettered by bankruptcy proceedings and free of a federally imposed stay of the pursuit of important state interests. Section 1452 was added in its present form as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, Title I, § 103(a), July 10, 1984 ("BAFJA"). Section 1452 and 11 U.S.C. § 362(b)(4) were designed specifically to work in tandem. *See* 1 Collier on Bankruptcy, ¶ 3.07[3] (15th ed. rev.2001) Therefore, interpretation of these two provisions should be consonant.

Applying the Third Circuit's pecuniary interest test, I conclude that the Emergen-

rubbish because the ordinance was designed to protect public health and safety and, therefore, the summons matter was within the "police and regulatory power" exception to § 1452).

**386**

cy Petition does not involve enforcement of a police or regulatory power. Although the overall purpose of the Article V of Pennsylvania's Insurance Act is to protect the interests of insureds, creditors and *the public generally* (40 P.S. § 221.1(c)(emphasis added)), the underlying purpose of the Emergency Petition is to declare the Lloyds Policies to be assets of RIC, subject to the Commissioner's control. The relief requested in the Emergency Petition seeks to take assets already within the control of the bankruptcy court and enable the Commissioner, and ultimately the policyholders and creditors of RIC, to gain a pecuniary advantage over other creditors of the Debtor's estate.[17] Accordingly, the Emergency Petition is not an enforcement of a police or regulatory power.

c. *The Commissioner is not acting as a "governmental unit."*

■ The Debtor argues that the Commissioner is not acting as a "governmental

unit" when pursuing the Emergency Petition in her role as rehabilitator (now liquidator), claiming she stands in the shoes of RIC and has rights that are ". . . not superior to nor 'more extensive than' those of the carrier whose affairs [she] is liquidating." *Commonwealth v. Commonwealth Mutual Ins. Co.*, 450 Pa. 177, 181, 299 A.2d 604, 606 (1973).

The Commissioner, however, relies upon *Herman v. Brown*, 160 B.R. 780 (E.D.La. 1993), in which the district court found that the Louisiana Commissioner of Insurance was acting as a "governmental unit" in an action against an individual debtor for violations of the Racketeer Influenced and Corrupt Organizations Act, federal securities law and state law provisions arising out of transactions involving the business of insurance.[18] Neither the caption nor the facts of *Herman* reveal whether the commissioner was acting in his role as an insurance company liquidator in bring-

---

**17.** The Emergency Petition can be distinguished from the Orphan's Court action in *In re Bankruptcy Appeal of Allegheny Health, Education and Research Foundation ("AHERF")*, 252 B.R. 309 (W.D.Pa.1999). In *AHERF,* the Pennsylvania Attorney General brought an action in state Orphans' Court against the debtor pursuant to the state's *parens patriae* powers seeking to protect the debtor's charitable endowments pursuant to Non–Profit Corporation Law, 15 Pa.C.S.A. § 5547(b). The *AHERF* Court recognized that "The Orphans' Court proceedings initiated by the Attorney General are not about advancing any pecuniary interest of the Commonwealth as a creditor, or that of any citizen-beneficiaries of the charitable corporations' charitable missions, but rather, are about its role as the sole champion of the public health, safety and welfare in matters affecting charitable trusts and foundations for which the public is an intended beneficiary." *AHERF,* 252 B.R. at 328. In contrast, the Emergency Petition seeks to control the Debtor's assets—although not for the pecuniary interest of the Commonwealth—ultimately, for the benefit of individual policyholders and creditors of RIC. Even

though the public may be an indirect beneficiary of the Commissioner's orderly liquidation of RIC, the public is not the intended beneficiary of the Emergency Petition.

The Emergency Petition can also be distinguished from the insurance commissioner's action in *Herman v. Brown*, 160 B.R. 780 (E.D.La.1993), against an individual debtor for violations under RICO, federal securities law and state law. The court found that action to be the enforcement of a police and regulatory power. The court concluded that the commissioner in *Herman* was not attempting to "gain an economic advantage over other creditors" and, therefore, did not fall within the pecuniary interest test. *Herman*, 160 B.R. at 783. Instead, the court found that the Commissioner was primarily motivated to effectuate public policy by preventing repeated violations of the insurance code. *Id.*

**18.** In *Herman*, the court was construing the term "governmental unit" in deciding whether the commissioner's action fell within the exception to the automatic stay in 11 U.S.C. § 362(b)(4).

ing the action, but it appears that fact was not necessary to the *Herman* court's decision, which said: "There is no way to separate the actions of the Commissioner as liquidator with the actions of Commissioner as Commissioner, nor has debtor pointed to any order requiring the Commissioner to act in the name of the insurer. The Commissioner is therefore acting as a governmental unit under § 362(b)(4), rather than as a private party." *Herman,* 160 B.R. at 784.

It is appropriate, however, to consider the Commissioner's role in a particular action to determine whether she is acting as a "governmental unit." [19] The definition of the term "governmental unit" as set forth in 11 U.S.C. § 101(27), includes a State or Commonwealth, as well as a "department, agency, or instrumentality of the ... State [or] ... Commonwealth." The plain language of the definition of "governmental unit" in § 101(27) does not include expressly an officer or commissioner of a state department or agency.

At least two courts have decided that an insurance commissioner is not acting on behalf of the state's interest when pursuing a lawsuit in his or her role as liquidator. *General Railway Signal Co. v. Corcoran,* 748 F.Supp. 639, 643–44 (N.D.Ill.1990), *rev'd on other grounds,* 921 F.2d 700 (7th Cir.1991); [20] *Skandia America Reinsurance Corp.,* 441 F.Supp. 715, 722 (S.D.N.Y.1977).[21] Although these cases look at the issue in the context of deciding whether the state is the real party in interest for diversity jurisdiction purposes, the analysis is useful for determining whether a state official is acting as a "governmental unit" for removal purposes under 28 U.S.C. § 1452.

Neither a state nor its alter ego [22] can be a "citizen" for purposes of diversity jurisdiction. *Pa. Human Relations Comm'n v. USAir, Inc.,* 615 F.Supp. 75, 76 (W.D.Pa.1985)(hereinafter, cited as *USAir* ). Therefore, to determine whether diversity jurisdiction exists in an action involving a state agency or officer, courts analyze whether the "state" is the real party in interest by examining factors such as: (1) the possibility that state resources may be used to satisfy a judgment against the agency; (2) the degree of agency autonomy; and (3) the extent of the state's interest in the outcome of the litigation. *Id.* at 77. The first factor is not applicable in the Emergency Petition, since the Com-

**19.** A court may consider whether an entity is a "governmental unit" when performing a particular activity. *Cf. Wade v. State Bar of Arizona (In re Wade),* 948 F.2d 1122, 1123–24 (9th Cir.1991) (Court concluded that the State Bar of Arizona was an instrumentality of the Arizona Supreme Court, and, therefore, a "governmental unit" under § 101(27), *for the purpose of conducting disciplinary proceedings.*)(emphasis added).

**20.** Although the district court opinion was reversed and remanded, the district court's conclusion that the state was not the real party in interest was affirmed at *General Railway Signal Co. v. Corcoran,* 921 F.2d 700 at 705, n. 3 (7th Cir.1991).

**21.** The court in *General Railway* found a "clear pattern" in the case law that "when a

state officer or agency is a party in its capacity as liquidator or receiver, the state is not considered to be the real party in interest" *(General Railway,* 748 F.Supp. at 643) and distinguished those cases in which the "insurance commissioners were parties not in their capacity as receivers, but rather as state agencies or officials directly asserting significant state interests." *Id.* at 644. *See* citations therein.

**22.** "The state need not be named as a party to defeat [diversity] jurisdiction; an officer or an agency which is simply 'the arm or alter ego of the State' may not be sued in diversity." *Skandia.,* 441 F.Supp. at 721(citations omitted).

missioner is the plaintiff and the Debtor has not asserted a claim against her.

In examining the second factor, courts in this jurisdiction have looked to the following: (i) whether the agency performs a proprietary or a governmental function; (ii) whether the agency is separately incorporated, has the power to sue and enter contracts and has autonomy over its operations; (iii) whether agency property is immune from state taxation; and (iv) whether the state has immunized itself from responsibility for agency operations. *USAir*, 615 F.Supp. at 77 (citing *Urbano v. Board of Managers of N.J. State Prison*, 415 F.2d 247, 251 (3d Cir.1969)). The parties submitted no evidence relating to these factors in connection with the Remand Motions and Venue Motions, but the Pennsylvania statute circumscribing the Commissioner's powers as a liquidator of an insolvent insurance company (40 P.S. § 221.23) does shed some light on the Commissioner's autonomy in that role. The statute grants the liquidator numerous powers, including the following: to employ agents, legal counsel, accountants, and others to assist in the liquidation (40 P.S. § 221.23(2)); to conduct public or private sales of the property of the insurer (40 P.S. § 221.23(7)); to enter into contracts as are necessary to carry out the order to liquidate (40 P.S. § 221.23(11)); to borrow money for the purpose of facilitating the liquidation (40 P.S. § 221.23(10)); to continue to prosecute or to institute in the name of the insurer, or in the commissioner's own name, any and all suits or other legal proceedings (40 P.S. § 221.23(12)); and to institute legal actions on behalf of the creditors, members, policyholders or shareholders of the insurer (40 P.S. § 221.23(13)). These actions have more of a proprietary than governmental function, since they are performed for the benefit of the creditors, members, policyholders or shareholders of the company

being liquidated. Further, the costs of administering the liquidation are paid from the assets marshaled by the liquidator (*see* 40 P.S. § 221.36(a) and § 221.44(a)), rather than from state funds.

The final factor to consider is the extent of the state's interest in the outcome of the removed litigation. In *USAir*, the court wrote: "For a state to be a real party in interest, the extent of interest must be more than a general governmental interest in the welfare of all citizens and in securing compliance with its laws." *USAir*, 615 F.Supp. at 78. *See also General Railway*, 748 F.Supp. at 644. In *USAir*, the court concluded that the Commonwealth was the real party in interest since it had a "specific and direct interest in securing compliance with the [Pennsylvania Human Relations Act]." *USAir*, 615 F.Supp. at 78. The *USAir* court relied upon a Pennsylvania Supreme Court decision, which noted that complaints initiated by the Pennsylvania Human Relations Commission "while often benefitting individual claimants, [are] filed on *behalf of the Commonwealth* as opposed to individual claimants with the intent of vindication of *the public interest* by eliminating discriminatory practices." *Id.*, (citing *Murphy v. Commonwealth of Pa. Human Relations Comm'n*, 506 Pa. 549, 486 A.2d 388, 393 (1985)) (emphasis in original).

The Emergency Petition was filed by the Commissioner, not on behalf of the Commonwealth, but in her role as liquidator for the benefit of creditors, members, policyholders or shareholders of RIC. The outcome does not affect the state treasury. *See General Railway*, 921 F.2d at 705, n. 3. The Commonwealth's interest in the Emergency Petition is confined to the general governmental interest in protecting the welfare of its citizens by enforcement of its laws regarding the orderly liquidation of insurance companies. This

general interest, coupled with the autonomy given to the Commissioner under the relevant statutory law, lead me to conclude that the Commonwealth is not the real party in interest in the Emergency Petition. Therefore, the Commissioner is not acting as a "governmental unit" in pursuing the relief requested in the Emergency Petition.

The Emergency Petition, therefore, was properly removed to this court.

### 2. Removal of the Trust Action under 28 U.S.C. § 1452 was proper.

■ The Commissioner argues also that the Debtor cannot remove the Trust Action under § 1452, because it falls within the exception for a governmental unit's enforcement of a police or regulatory power. The Trust Action, like the Emergency Petition, seeks to move assets out of the control of the bankruptcy court and into the control of the Commissioner for the

benefit of creditors, members, policyholders or shareholders of RIC. For the reasons set forth in Section II.A.1. above, I conclude that the Commissioner is not enforcing a police or regulatory power and is not acting as a governmental unit in the Trust Action. Therefore, the Trust Action was removed properly under Section 1452.

### 3. Removal of the Trust Action under 28 U.S.C. § 1441.

The Debtor argues also that the Trust Action was removed properly under § 1441, which does not contain the "police or regulatory power" exception. The Commissioner argues that the restrictions on removal found in § 1452 should also apply to removals under § 1441.[23] Because I conclude that both State Court Actions were removed properly under § 1452, I need not decide whether the Trust Action also is removable under § 1441.[24]

**23.** The Commissioner cites to 1 Collier On Bankruptcy ¶ 3.07[2] (15th ed. rev.2001), which states: "Whether the exceptions to removal contained in section 1452 should apply to removal effected under section 1441 is another issue altogether; the bankruptcy policy announced in section 1452 ought to apply to all removals, whether under section 1452 or 1441." No case law is cited to support this view.

**24.** The United States Supreme Court concluded that Congress did not intend that § 1452 would be the exclusive basis for removals and remands of bankruptcy related cases. *Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 129, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995). Other bankruptcy courts that have considered the U.S. Supreme Court's decision in *Things Remembered* and the relationship between the general remand statute (28 U.S.C. § 1447(c)) and the more specific bankruptcy remand statute (28 U.S.C. § 1452(b)) have said:

[*Things Remembered*] which holds that § 1447(c) and § 1452(b) can "comfortably coexist in the bankruptcy context," means that § 1447(c) can be applied to bankruptcy

removals and remands instead of (or to fill gaps in) § 1452(b) and its implementing rules when: (1) the preconditions of § 1447 are satisfied; and (2) doing so would not be inconsistent with § 1452(b). *Things Remembered,* 516 U.S. at 127, 116 S.Ct. at 497.

*In re Hotel Mt. Lassen, Inc.,* 207 B.R. 935, 939 (Bankr.E.D.Ca.1997). *See also In re Ciclon Negro, Inc.,* 260 B.R. 832, 836 (Bankr.S.D.Tx. 2001).

It may be that the general removal statute (28 U.S.C. § 1441) and the bankruptcy removal statute (28 U.S.C. § 1452) should likewise coexist, allowing a defendant to remove a bankruptcy matter under either section, if: (1) the preconditions for removal under § 1441 are met; and (2) removal under § 1441 would not be inconsistent with the provisions of § 1452. This approach follows the rule of statutory construction that a statute should be construed so that all of its provisions are brought into harmony. *See Housing Authority of Pittsburgh v. Collins (In re Collins),* 199 B.R. 561, 567 (Bankr.W.D.Pa. 1996).

Because the § 1452 police or regulatory power exception does not apply in this case,

## B. Sequence in which the Remand Motions and Venue Motions are considered.

■ Since I have determined that the State Court Actions were removed properly, I must now consider whether they should remain in this court, be remanded to the Commonwealth Court and/or transferred to the New York Bankruptcy Court. As a threshold matter, the Debtor argues that these are decisions best left to the "home court" (i.e., the bankruptcy court in which the main bankruptcy case is pending) because that court is more familiar with the affairs of the Debtor's estate.

In *Grace Community, Inc. v. KPMG Peat Marwick, LLP, et al. (In re Grace Community, Inc.)*, 262 B.R. 625, 628–29 (Bankr.E.D.Pa.2001), which, like the matters presently before me, involved competing abstention, remand and venue motions, I considered first the abstention issue.[25] But in *Grace Community*, unlike the matters presently before me, all of the factors for mandatory abstention were present and no other issues required my decision.[26] My conclusion below that manda-

tory abstention is *not* available here requires consideration of the Commissioner's arguments for discretionary abstention and equitable remand. This next level of review calls for exercise of the bankruptcy court's discretion. Whether the "removal" court should defer to the home court to consider matters involving the exercise of a bankruptcy court's discretion should be considered on a matter by matter and case by case basis. *See In re Harnischfeger Indus., Inc.*, 246 B.R. 421, 436 n. 42 (Bankr.N.D.Ala.2000)(disagreeing with cases holding that transfers to home bankruptcy courts should be virtually automatic).[27] In the present matter, the parties have well and fully briefed and argued the issues of remand, abstention and change of venue. Under the circumstances pertaining here, I perceive no particular benefit to the parties or to the New York Bankruptcy Court by deferring to that court decision of any of the outstanding motions. Neither do I perceive any harm by deciding the matters here. Rather, it should serve as a benefit to all that these matters are resolved now by this court.[28]

removal of the Trust Action under § 1441 might not be viewed as an "end run" around the § 1452 restrictions. However, if the police and regulatory power exception of § 1452 did apply to the Trust Action, the more challenging question would be: should the exceptions in § 1452 prevent a defendant from removing a bankruptcy related matter, if the defendant otherwise could have removed the matter under § 1441 on the basis of diversity jurisdiction (§ 1332)? At least one court has decided that matters cannot be removed directly to the bankruptcy court on the basis of diversity jurisdiction. *Seale v. Home Cable Concepts, Inc. (In re Best Reception Systems, Inc.)*, 219 B.R. 980, 983 (Bankr.E.D.Tenn.1998)(However, the § 1452 exceptions were not at issue.).

25. In *Grace Community*, I followed the line of decisions holding that, before a court can decide a motion to transfer or change venue, it must first decide whether any removal was proper and/or whether the court has subject

matter jurisdiction over the removed proceeding. The home court in *Grace Community* was the Bankruptcy Court for the Middle District of Pennsylvania.

26. *See* discussion regarding mandatory abstention in Section II.C., *infra*.

27. Indeed, at the request of the parties, and after consultation with Judge Gonzales (with the consent of the parties), I earlier deferred consideration of the Remand Motions and the Venue Motions until the parties argued, and Judge Gonzales decided, various motions pending before him and raising identical or similar issues, including the Commissioner's request for dismissal of the RGH chapter 11 case. Subsequently, those matters were withdrawn or resolved and the parties resumed in this court the prosecution of their competing requests for relief.

28. It may be appropriate for the "removal court" to decide a remand and abstention

## C. *Mandatory Abstention.*

 Having concluded that both the Trust Action and the Emergency Petition were properly removed and that the Remand Motions and the Venue Motions should be decided by this court, I now turn to whether this court must abstain from acting in these removed matters. The Commissioner argues that the court must abstain from hearing the State Court Actions pursuant to the mandatory abstention provision of 28 U.S.C. § 1334(c)(2), which says:

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

 There are six requirements to be met for mandatory abstention:

(1) a timely motion is made; (2) the proceeding is based upon a state law claim or state law cause of action; (3) the proceeding is related to a case under title 11; (4) the proceeding does not arise under title 11; (5) the action could not have been commenced in a federal court absent jurisdiction under 28 U.S.C. § 1334; and (6) an action is com-

menced, and can be timely adjudicated, in a state forum of appropriate jurisdiction. *RBGSC Investment,* 253 B.R. at 381; *In re Rarick,* 132 B.R. 47, 50 (D.Colo.1991); *Warren,* 125 B.R. at 131; *In re Futura Industries, Inc.,* 69 B.R. 831, 834 (Bankr.E.D.Pa.1987).

*Grace Community,* 262 B.R. at 630. The Debtor argues that the fourth and sixth factors are not met in this case.[29] All six of the § 1334(c)(2) factors must be present for mandatory abstention to be warranted, so the absence of only one of these factors serves as a bar to mandatory abstention.

 Section 1334(c)(2) mandatory abstention does not apply to proceedings that "arise under" title 11 or "arise in" a case under title 11, which are also known as "core proceedings" (fourth factor). *Grace Community,* 262 B.R. at 631. *See also In re RBGSC Investment Corp.,* 253 B.R. 369, 381 (E.D.Pa.2000). To reach the necessary understanding of what is "core," a brief examination of bankruptcy court jurisdiction is helpful. Enactment of the Bankruptcy Reform Act of 1978 represented an attempt by Congress to centralize bankruptcy jurisdiction by granting bankruptcy courts expanded jurisdiction over cases arising under title 11. *Halper v. Halper,* 164 F.3d 830, 835–36 (3d Cir.1999). The U.S. Supreme Court struck down that arguably well-intentioned, but flawed, jurisdictional scheme in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), holding "the 1978 jurisdictional re-

---

prior to a venue motion if transferring the matter to the home court will only cause further delay or result in a waste of judicial resources. *Grace Community,* 262 B.R. at 628–29 (citing *Ni Fuel Co., Inc. v. Jackson,* 257 B.R. 600, 611–12 (N.D.Okla.2000)).

29. The only mandatory abstention factors about which the parties disagreed were the fourth and sixth factors. However, the Trust

Action may also fail to meet the test of the fifth factor (that the action could not have been commenced in a federal court absent jurisdiction under 28 U.S.C. § 1334) if diversity jurisdiction under 28 U.S.C. § 1332 is proper. Because I concluded that the Trust Action was removed properly under § 1452, I did not reach the issue of whether the Trust Action could also be removed on the basis of diversity jurisdiction under 28 U.S.C. § 1332.

**392**

form unconstitutional because its grant of judicial power to Article I Bankruptcy Courts violated the separation of powers doctrine by undermining Article III's establishment of an independent judiciary." *Halper*, 164 F.3d at 835. In 1984, Congress responded to *Marathon* by passing BAFJA, which included 28 U.S.C. § 1334 and § 157, adopting the present Byzantine jurisdictional scheme, which resembles, in many respects, the jurisdictional scheme under the former Bankruptcy Act. Specifically, § 1334(b) confers upon district courts jurisdiction over all civil proceedings arising under title 11 or arising in a case under title 11, and all civil proceedings related to a case under title 11.[30] The practical consequence of the distinction between core and non-core is this: in core matters, bankruptcy courts may render final decisions (28 U.S.C. § 157(b)(1)); in non-core matters, bankruptcy courts make only proposed findings of fact and conclu-

sions of law for consideration by the district court (28 U.S.C. § 157(c)(1)).

*Halper* set forth the following test for deciding whether a matter is a core proceeding:

> To determine whether a proceeding is a "core" proceeding, courts of this Circuit must consult two sources. First, a court must consult [28 U.S.C.] § 157(b). Although § 157(b) does not precisely define "core" proceedings, it nonetheless provides an illustrative list of proceedings that may be considered "core." *See id.* § 157(b)(2)(A)-(O). Second, the court must apply this court's test for a "core" proceeding. Under that test, "a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."

*Halper v. Halper*, 164 F.3d at 836 *(* citations omitted*)*.[31]

---

30. "Related to" proceedings constitute the outer boundaries of bankruptcy court jurisdiction. Core proceedings represent a subset of "related to" proceedings. *Adams v. Prudential Securities, Inc. (In re Foundation for New Era Philanthropy)*, 201 B.R. 382, 387–88 (Bankr.E.D.Pa.1996)(Fox, J). *See also In re Central Ice Cream Co.*, 82 B.R. 933, 936 (N.D.Ill.1987)("a proceeding that is not a related proceeding *a fortiori* cannot be a core proceeding").

To determine whether a civil proceeding is "related to" a bankruptcy case, the Third Circuit Court of Appeals has said that a court must decide "...whether the outcome of [the civil proceeding] could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984) (citations omitted), *overruled on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 134–35, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995)(Stevens, J. concurring). The *Pacor* test for "related to" jurisdiction was discussed favorably by the U.S. Supreme Court in *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 1499, 131 L.Ed.2d 403 (1995), and in footnote 6 of *Celotex*, the Supreme Court noted that

eight other circuit courts adopted the *Pacor* test with little or no variation.

The relief sought in the State Court Actions aims to take property out of the Debtor's bankruptcy estate, thus directly impacting the bankruptcy estate and creditors. Clearly, the actions are "related to" the bankruptcy case.

31. Not all circuits are in agreement on the boundaries of a bankruptcy court's core jurisdiction. For example, the Fifth Circuit Court of Appeals' formulation of the bankruptcy court's core jurisdiction as set forth in *Wood v. Wood (In re Wood)*, 825 F.2d 90 (5th Cir. 1987), is reflective of a reading of *Marathon* which, at least one court has said, is more, rather than less, restrictive of such jurisdiction. *See PSINet, Inc. v. Cisco Systems Capital Corp. (In re PSINet, Inc.)*, 271 B.R. 1, 29 (Bankr.S.D.N.Y.2001). A number of opinions by the Third Circuit Court of Appeals on the core/non-core distinction employ the *Wood* standard. *See Torkelsen v. Maggio (In re Guild and Gallery Plus, Inc.)*, 72 F.3d 1171, 1178 (3d Cir.1996); *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 267 (3d Cir.1991); *Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir.1990). By way of contrast, the Second

To determine whether the State Court Actions are "core" matters under the Third Circuit's *Halper* test, I must analyze the nature of the claims being asserted. The State Court Actions request a determination of who owns or should control particular assets (i.e. cash and insurance proceeds) that were in the possession of the Debtor at the time of the bankruptcy filing. The Debtor argues that the State Court Actions are "core" because they involve a determination of whether the property in dispute is "property of the estate" under § 541 and because they are matters concerning administration of the estate.

*Halper* instructs that the first place to turn to for guidance about what is "core" is the non-exhaustive list of core proceedings set forth in 28 U.S.C. § 157(b). Section 157(b) does not refer explicitly to actions to determine property of the estate under § 541. A determination concerning what constitutes property of the estate may be core when the results of such determinations, as they are in the State Court Actions, are central to the possible success or failure of any reorganization.[32] It can be argued that at least two of the enumerated "core" proceedings in § 157(b) are implicated by a Section 541 determination: 28 U.S.C. § 157(b)(2)(A) ("matters concerning the administration of the estate") and/or (O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship"). Bankruptcy courts, however,

must exercise caution, particularly when employing § 157(b)(2)(A) as the only basis for finding core jurisdiction, or else risk crossing the boundaries drawn by *Marathon*, as further refined by *Halper*. See *PSINet*, 271 B.R. at 28. In this matter, however, I do not rely upon any of the enumerated items of the § 157(b) list.

■■■ The Commissioner argues that the claims asserted in the State Court Action are non-core because she commenced her state law-based causes of action against the Debtor prepetition, and she has not filed a proof of claim; therefore, the bankruptcy petition filing should not change the state law character of her claims. *Asousa Partnership v. Pinnacle Foods, Inc. (In re Asousa Partnership)*, 264 B.R. 376 (Bankr.E.D.Pa.2001). In *Asousa*, the bankruptcy court said:

> [W]hen no proof of claim is filed, claims (or counterclaims) asserted against the debtor pre-petition are not transformed into core proceedings simply because the debtor files for bankruptcy and removes them.

*Asousa*, 264 B.R. at 387. The *Asousa* case involved a state court landlord-tenant dispute, initiated by debtor-landlord for ejectment and payment of rent. The tenant filed counterclaims against the debtor-landlord based on the debtor-landlord's alleged failure to deliver the premises in a usable condition and failure to make improvements and repairs. Judge Sigmund concluded that the state court action could not be removed to bankruptcy court and

---

Circuit has said that "Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits . . . .pressing the notion to its constitutional bounds." *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir.1990), quoting *In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir.1987)(Breyer, J.), which, in turn, relied upon statements of the legislative sponsors of the BAFJA. *See PSINet, supra*, for an

extensive survey of Second Circuit law on this subject.

32. Although the Debtor in this case may be planning a liquidation, rather than a reorganization, ownership of the cash and rights over the insurance policy proceeds would still greatly impact the distribution of assets to creditors if the Debtor's plan is for an orderly liquidation of assets.

**394**

treated as a core "objection to claim" proceeding under § 157(b)(2)(B) when the tenant had not filed a proof of claim. The Commissioner has not filed a formal proof of claim in the Debtor's case. But the basis upon which I find core jurisdiction over the Commissioner's State Court Actions (as discussed below) is not predicated upon § 157(b)(2)(B). Therefore, whether the Commissioner has filed a proof of claim is not relevant to my conclusion and the *Asousa* analysis does not guide me here.[33]

The second part of the *Halper* test provides that a matter is a core proceeding if it either (1) invokes a substantive right provided by title 11; or (2) if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case. This part of the test is based upon the "arising in" or "arising under" title 11 language in 28 U.S.C. § 1334(b). The distinction between actions that "arise under" title 11 or "arise in" a case under title 11 was considered by the Fifth Circuit Court of Appeals in *Wood:*

> Congress used the phrase "arising under title 11" to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11. Apparently, the phrase was taken from 28 U.S.C. § 1331, conferring federal question jurisdiction in which it carries a similar and well-accepted meaning. The meaning of "arising in" proceedings is less clear, but seems to be a reference to those "administrative" matters that arise *only* in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on

any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.

*Wood,* 825 F.2d at 96–97.

1. *The State Court Actions are core proceedings, because the issues at the heart of the actions "arise under" title 11 by requiring a determination of whether the assets in dispute are property of the Debtor's bankruptcy estate as defined in Bankruptcy Code § 541.*

 Section 541(a) of the Bankruptcy Code defines "property of the estate" and provides that the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Various courts have concluded that matters requiring a declaration of whether certain property comes within § 541's definition of "property of the estate" are core proceedings. *See Pension Benefit Guaranty Corp. v. Continental Airlines, Inc. (In re Continental Airlines),* 138 B.R. 442, 445 (D.Del.1992) (A determination regarding property of the estate is a core proceeding); *All American Laundry Service v. Ascher (In re Ascher),* 128 B.R. 639, 643 (Bankr.N.D.Ill.1991)(When a debtor and its creditors claim interests in property asserted to be part of the estate, the bankruptcy court has core jurisdiction to adjudicate all of those interests); *Knopfler v. Schraiber (In re Schraiber),* 97 B.R. 937, 939–40 (Bankr.N.D.Ill.1989)(Bankruptcy court has core jurisdiction to determine

---

**33.** The State Court Actions do not "arise in" the bankruptcy because, when originally filed, the State Court Actions had an existence independent of the Debtor's bankruptcy case in state court under the Pennsylvania insurance law. However, the Debtor's bankruptcy filing created an estate under Bankruptcy Code

§ 541 and, thereafter, the State Court Actions could no longer be viewed in a vacuum. That they were commenced in state court prior to the Debtor's chapter 11 filing does not preclude a determination that they are "core" proceedings.

what is estate property and can apply state law or any other relevant authority in making such a determination).[34] "[A] determination of what is property of the estate and concurrently, of what is available for distribution to creditors of that estate, is precisely the type of proceeding over which the bankruptcy court has exclusive jurisdiction." *Ascher*, 128 B.R. at 643. This is so, even though such a determination may rest upon interpretation of state law. *Continental*, 138 B.R. at 445 ("The determination of each party's interest in the property is made by reference to the applicable state's law, *Butner v. United States*, 440 U.S. 48, 55–56, 99 S.Ct. 914, 917–919, 59 L.Ed.2d 136 (1979), and the Bankruptcy Code determines whether that particular interest may properly be included in the property of the estate.").[35]

2. *Case law supports the view that actions regarding constructive trust and insurance policy issues are core proceedings.*

The Fourth Circuit Court of Appeals said:

Clearly, the only proper forum for determining whether assets held by a debtor are held in constructive trust is the bankruptcy court, and such proceedings must be considered core proceedings....The finding of a constructive trust by the bankruptcy court and a determination of the proper distribution of that trust are intimately tied to the traditional bankruptcy functions and estate, and, therefore, are core matters within the clear jurisdiction of the bankruptcy court.

**34.** While a determination of what constitutes property of a bankruptcy estate seems an inherently core matter, it would be overly broad to conclude that *every* matter that implicates "property of the estate" is a core matter. In *Celotex Corp. v. AIU Insurance Co. (In re Celotex Corp.)*, 152 B.R. 667, 672 (Bankr.M.D.Fla. 1993), the bankruptcy court said that a conclusion that all matters dealing with property of the estate are core matters would not comport with the United States Supreme Court's decision *Marathon*. The *Celotex* court decided, however, that any proceeding pertaining to property of the estate should be *presumed* to be a core proceeding, which presumption could be rebutted. *Celotex*, 152 B.R. at 673 (emphasis supplied). In discussing this presumption, the *Celotex* court wrote:

[W]here the action brought in a Chapter 11 case by the debtor-in-possession is a declaration of rights and not a mere state court contract action, then the presumption of core continues....The presumption is even stronger when the declaration of rights is coupled in a material way with the reorganization of the debtor. Even in *Marathon*, the court stated "[b]ut the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the

right to recover contract damages that is at issue in this case.... Therefore, some nexus between the matter and the reorganization process again encourages the presumption of core."

*Celotex*, 152 B.R. at 674. The court's analysis in *Celotex* is a thoughtful treatment of this issue, but I am not prepared to employ a rule that *any* proceeding pertaining to property of the estate is presumptively core. While use of such a device may not be inconsistent with *Marathon*, *Halper*, and *Wood*, I prefer, in analyzing such matters, a less mechanical approach.

**35.** I do not subscribe to the view that the bankruptcy court has *exclusive* jurisdiction over all core matters, seemingly expressed in this passage quoted from *Ascher* and in the passage quoted from *Johnson*, below. If this were so, why would § 1334 permit discretionary abstention involving core matters and why would § 1452 permit equitable remand of core matters? *See, also*, 28 U.S.C. § 1334(b)("Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original *but not exclusive* jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.") [emphasis added.]

*Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 402 (4th Cir.1992). *See also In re Treco,* 205 B.R. 358, 363–64 (S.D.N.Y.1997). Case law also supports the conclusion that an action for declaratory relief regarding the debtor's rights under insurance policies is a core proceeding. *Celotex,* 152 B.R. at 676.

3. *There is historical support for the proposition that the determination of ownership of property in the possession of a debtor is core in nature.*

Under the former Bankruptcy Act, bankruptcy courts were given summary jurisdiction over all property in the actual or constructive possession of the debtor as of the date of filing the bankruptcy petition. *PSINet,* 271 B.R. at 32 (citing *In re Land Investors, Inc.,* 544 F.2d 925, 929 (7th Cir.1976)). This jurisdiction was not viewed as constitutionally infirm under the former Bankruptcy Act and the present Bankruptcy Code effected no change in this respect from the prior law. Therefore, the exercise of such jurisdiction does not run afoul of *Marathon. PSINet,* 271 B.R. at 31–35.

For the foregoing reasons, I conclude that the State Court Actions are core proceedings; hence, they are not subject to mandatory abstention of 28 U.S.C. § 1334(c)(2).[36]

### D. *Discretionary Abstention.*

The Commissioner has also asked this court to exercise discretionary abstention with respect to the State Court Actions pursuant to 28 U.S.C. § 1334(c)(1), which provides as follows:

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

■ A court should consider discretionary abstention when the party seeking abstention satisfies most of the six mandatory abstention factors, discussed in Section II.C. above. *Grace Community,* 262 B.R. at 630, n. 7 (citing *In re Warren,* 125 B.R. 128, 132 (E.D.Pa.1991)); *In re Futura Industries, Inc.,* 69 B.R. 831, 834 (Bankr.E.D.Pa.1987). Since I have concluded that the actions are core proceedings, i.e., they arise "under" title 11, both State Court Actions fail to meet at least one factor (the fourth factor) for mandatory abstention.

The second factor inquires whether the "proceeding is based upon a state law claim or state law cause of action." The extent of the debtor's interest in property is determined in this case by applying state law. *Butner,* 440 U.S. at 54, 99 S.Ct. 914 (Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law); *In re O'Dowd,* 233 F.3d 197, 202 (3d Cir. 2000)(While federal law defines what types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property). Once the nature of the Debtor's interest in the cash and insurance policies is determined under applicable non-bankruptcy law, in this case state law, it must then be determined whether such interest fits within the definition of estate property under Bankruptcy Code § 541(a).[37] Hence, disposition of

---

**36.** I also conclude that the State Court Actions would be timely adjudicated in state court, thereby meeting the sixth factor for mandatory abstention. A fuller discussion of this issue is contained in Section II.D., *infra,* as it also relates to discretionary abstention.

**37.** *See, e.g., Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233 (3d Cir.

the claims in the State Court Actions presents mixed questions of federal bankruptcy law and state law. But because the state law issues must be decided first, this factor weighs more heavily in favor of abstention.

■ The Debtor also argues that the Commissioner has not met her burden for establishing the sixth factor for mandatory abstention because she did not present any evidence that the State Court Actions would be timely adjudicated in the state court. The movant must demonstrate that the proceeding can be timely adjudicated in a state forum. *Paxton Nat'l Ins. Co. v. British American Assoc. (In re Pacor, Inc.)*, 72 B.R. 927, 932 (Bankr.E.D.Pa. 1987). A court also considers items such as the state court's calendar, the status of the bankruptcy proceeding, the complexity of the issues, and whether the state court proceeding would prolong the administration or liquidation of the estate. *See Allard v. Benjamin (In re DeLorean Motor Co.)*, 49 B.R. 900, 911 (Bankr.E.D.Mich. 1985). The *Allard* court took judicial notice of the crowded dockets in the state courts, particularly the county involved, and found the earliest trial date that the state court could assign to the case would be 30–36 months after remand. The *Allard* court found that abstention was not appropriate when "irreparable delay, and injury will result to the interest of the estate or its creditors." *Allard*, 49 B.R. at 911.

The Commissioner attached the Commonwealth Court's Statistical Report for 2000 as an exhibit to her reply brief and asked that I take judicial notice of it pursuant to Fed. R. Evid. 201.[38] The Commonwealth Court docket for the RIC liquidation proceeding (attached as an exhibit to the Commissioner's brief) shows that it is a "miscellaneous" matter under the court's reporting system. Only 75 miscellaneous cases were filed in 2000, and only 2 of the 75 miscellaneous matters were liquidation petitions brought by the Pennsylvania Insurance Department. The Statistical Report shows that 88% of the appellate cases filed in the Commonwealth Court were disposed of in less than a year; however, the Statistical Report did not include figures regarding the average length of time to dispose of the Commonwealth Court's original jurisdiction and miscellaneous cases in 2000. The overall information in the report indicates that the majority of matters before the Commonwealth Court are disposed of in a timely manner. There is no indication that the State Court Action would be subject to any backlog or delay, nor any indication that adjudication in the Commonwealth Court would unduly prolong the administration or liquidation of the bankruptcy estate. Therefore, I conclude that the sixth factor is satisfied in this case and that the parties are likely to receive timely determination of the causes of action in the Commonwealth Court.

The Emergency Petition meets five of the six factors for mandatory abstention, i.e. (1) a timely motion was made; (2) the proceeding is (mostly) based upon a state law claim or cause of action; (3) the proceeding is related to a case under title

---

2001)(The debtor's interest in its grant relationship with the Department of Housing and Urban Development, as defined by applicable non-bankruptcy law, was insufficient to constitute § 541 estate property).

**38.** "Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact 'not subject to reasonable dispute'…[and] so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir.1995). The Debtor expressed no objection to my use of the Report.

11;[39] (4) the action could not be commenced in a federal court absent jurisdiction under 28 U.S.C. § 1334; and (5) an action is commenced, and can be timely adjudicated in a state forum of appropriate jurisdiction. The Trust Action meets at least four of the six factors; in addition to being a core proceeding, it may not meet the jurisdictional factor. (*See* n. 29, *supra.*)

Accordingly, because most of the mandatory abstention factors are met for both State Court Actions, it is appropriate to consider § 1334(c)(1) discretionary abstention. In the case *Stephen Smith Home For The Aged, Inc. v. Mercy Douglass Center, Inc. (In re Stephen Smith Home for the Aged, Inc.)*, 80 B.R. 678 (E.D.Pa. 1987), Judge Ludwig of the District Court for the Eastern District of Pennsylvania adopted the opinion of Bankruptcy Judge Fox, which discussed the background of the discretionary abstention statute:

In a previous decision, I have recognized:

In contrast to mandatory abstention, section 1334(c)(1) is derived from former 28 U.S.C. § 1471(d) which, in turn, was a statutory response to concerns articulated in *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940); H.R.Rep. No. 595, 95th Cong., 1st Sess. 446 (1977), U.S.Code Cong. & Admin. News 1978, p. 57; *accord In re Cemetery Development Corp.*, 59 B.R. [115] at 125 [Bankr.M.D.La. 1986]; 1 *Collier* ¶ 3.01 at 3–57 to 58. *In re Earle Industries, Inc.*, 72 B.R. [131], 133 [Bankr.E.D.Pa.1987].

In *Thompson*, the Supreme Court held that:

A court of bankruptcy has an exclusive and nondelegable control over the administration of an estate in its possession. But the proper exercise of that control may, where the interests of the estate and the parties will best be served, lead the bankruptcy court to consent to submission to state courts of particular controversies involving unsettled questions of state property law and arising in the course of bankruptcy administration ... Unless the matter is referred to the state courts, upon subsequent decision by the Supreme Court of Illinois it may appear that rights in local property of parties to this proceeding have—by accident of federal jurisdiction—been determined contrary to the law of the state which in such matters is supreme. (citations omitted.)

Allowing state courts to first decide unsettled cases of state law is but one aspect of comity and federalism. Another is the recognition of important state interests in the outcome of various disputes. (citations omitted.)

*Stephen Smith*, 80 B.R. at 683.

### 1. *Discretionary abstention is appropriate for the Trust Action.*

█ Many of the important considerations discussed in *Stephen Smith, supra*, apply to the Trust Action. Although the Debtor has argued that the Trust Action involves nothing more than ordinary contract law issues (based upon interpretation of the Tax Allocation Agreement) and constructive trust issues that bankruptcy courts routinely decide, the Debtor's argument fails to recognize that the Trust Action also requires consideration and interpretation of the Pennsylvania Insurance Holding Company Act, 40 P.S. § 991.1401 *et seq.*, (the "Insurance Holding Company Act") when analyzing the

---

**39.** See n. 30, *supra.*

Tax Allocation Agreement. The Insurance Holding Company Act is part of the overall state regulatory scheme regarding insurance companies, which is recognized to be an important state interest by Congress, as embodied in the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*[40] *See also Lac D'Amiante du Quebec, Ltee v. American Home Assurance Co.*, 864 F.2d 1033 (3d Cir.1988).[41] Through the Insurance Holding Company Act, Pennsylvania regulates domestic insurers and the affiliates that control them. Therefore, "ordinary" contract disputes between RIC and the Debtor regarding the Tax Allocation Agreement must be viewed in light of the substantial regulatory scheme set forth in the Pennsylvania's Insurance Holding Company Act.[42]

There appears to be no case law interpreting that portion of the Insurance Holding Company Act (particularly 40 P.S. § 991.1405—"Standards and management of an insurer within a holding company system") which the Commissioner contends must be reviewed to determine the relief requested in the Trust Action.[43] Among other things, Section 991.1405 requires all transactions within a holding company system to be "fair and reasonable," which terms are not specifically de-

---

**40.** Congress enacted the McCarran–Ferguson Act in response to *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that the dormant Commerce Clause of the Constitution preempted state insurance regulation. *Ochs v. Simon (In re First Central Fin. Corp.)*, 269 B.R. 502, 518 (Bankr.E.D.N.Y.2001)(citing *In re Rubin*, 160 B.R. 269, 278 (Bankr.S.D.N.Y.1993)). Section 1011 of the McCarran–Ferguson Act (15 U.S.C. § 1011) provides that:

> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States. Section 1012(a) of the McCarran–Ferguson Act (15 U.S.C. § 1012(a)) further provides that:
> (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several states which relate to the regulation or taxation of such business.

**41.** The Third Circuit recognized the state's interest in regulating insurance companies, writing: "[T]he regulation of insurance companies unable to meet their obligations entails the type of strong state interest in which application of *Burford* abstention is appropriate. Like the valuable natural resource involved in *Burford*, solvent and healthy insurance coverage is an essential state concern." *American Home Assurance*, 864 F.2d at 1045. The *Bur-*

*ford* abstention doctrine is discussed in this section, *infra.*

**42.** This state statutory overlay was not present in *Superintendent of Ins. for New York, as Liquidator of First Central Ins. Co. v. First Central Fin. Corp. (In re First Central Fin. Corp.)*, 269 B.R. 481 (Bankr.E.D.N.Y.2001). During the February 13, 2002 supplemental oral argument, counsel opposing abstention argued that the *First Central* court did recognize that there had been management misconduct, but then decided that such issues could not be considered in interpreting the tax allocation agreement before it, a simple exercise in contract law. This decision, however, arose in the context of whether the company's executives' prior course of self-dealing should be considered in interpreting the contract. This question is not presented here. Moreover, no insurance-related state statute was apparently at issue in that decision, as exists here. Even if there were, I agree with the Commissioner that the Tax Allocation Agreement at issue here should be viewed against the backdrop of the statutorily-imposed fairness requirement. Ultimately, however, that decision will be left to the state court.

**43.** Neither party could direct the court to any decision interpreting this section of the statute, which was codified as currently written in 1992 by P.L. 1519, No. 178, § 19 (December 18, 1992). Prior to that, similar language was found in 40 P.S. 459.7(c) (1991) which was codified in 1971 by P.L. 263, No. 65, § 4 (July 29, 1971).

fined.[44] In this situation, it is appropriate to defer and allow the state courts to interpret first the state's regulatory statutes, especially with respect to the statutory scheme established by the state's insurance act.

The Commissioner also argues that the *Burford* abstention doctrine[45] is applicable to the Trust Action. The standard for the *Burford* abstention doctrine is as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Feige v. Sechrest,* 90 F.3d 846, 847 (3d Cir.1996) (citations omitted).

With respect to the Trust Action, timely and adequate state court review of the issues is available in the Commonwealth Court. The first prong of the *Burford* test is applicable to this matter because the lack of state law to guide a federal court working to interpret the statutory scheme makes resolution of the Trust Action's issues more difficult. Because regulation of state insurers is recognized to be an important state interest, the remainder of the first prong is also met, because it is preferable for state courts to interpret the Insurance Holding Company Act. Likewise, the second prong of the *Burford* abstention test is met, because this part of state law regulating insurance holding companies in Pennsylvania is undeveloped, and the state court should have the first opportunity to interpret the law and establish a coherent policy with respect to an area of "substantial public concern," such as the state regulation of insurance holding companies.[46]

**44.** There is decisional law in Pennsylvania addressing and governing the relations between and among parent corporations, their subsidiaries and their respective directors, shareholders and creditors. *E.g., see generally, Lumax Indus., Inc. v. Aultman,* 543 Pa. 38, 669 A.2d 893 (1995). At issue here, though, at least in part, is interpretation of a state statute that is, as yet, uncircumscribed by decisional law. The Third Circuit Court of Appeals has recognized that "...it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 2002 WL 29740, *3 (3d Cir. 2002).

**45.** This doctrine is so named because it was first enunciated by the Supreme Court in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), holding that "federal courts should exercise equitable discretion and refrain from exercising authority over questions involving basic problems of state policy pertaining to the regulation of important state natural resources, even if fed-

eral court jurisdiction is predicated on diversity of citizenship." *Grode v. Mutual Fire, Marine and Inland Ins. Co.,* 8 F.3d 953, 956 (3d Cir.1993). In the 1996 decision *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), the Supreme Court clarified that federal courts should only dismiss or remand cases under the *Burford* abstention doctrine if equitable or discretionary relief is sought. *Id.,* at 730, 116 S.Ct. 1712. Abstention may be applicable in a damages action, but in such a case it is more appropriate for the federal court to postpone or stay the damages action while the state court decides a disputed question of state law. *Id.,* at 730–31, 116 S.Ct. 1712. Because the Trust Action seeks equitable relief, it may be remanded rather than stayed.

**46.** Federal courts are periodically called upon to divine state law before the state appellate courts have established it. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 349 (3d Cir.2001). However, the matter before me does not *re-*

The Debtor relies upon cases such as *Suter v. Munich Reinsurance Co.*, 223 F.3d 150 (3d Cir.2000), *Grode v. Mutual Fire, Marine and Inland Ins. Co.*, 8 F.3d 953 (3d Cir.1993), and *Koken v. Cologne Reinsurance (Barbados) Ltd.*, 34 F.Supp.2d 240 (M.D.Pa.1999) to argue that abstention is not appropriate for the Trust Action. Those decisions are distinguishable, each involving an action brought by the insurance commissioner, as liquidator of an insolvent insurance company, in state court against a foreign reinsurer to recover damages for the reinsurer's failure to perform under certain reinsurance contracts or treaties. The foreign reinsurers removed the actions to federal court and, in each case, the liquidator moved for remand and/or abstention. In those cases, the courts did not remand or abstain, finding (among other things) that the actions involved ordinary contract issues for unpaid debts (*Munich Reinsurance*, 223 F.3d at 161; *Mutual Fire*, 8 F.3d at 961; *Cologne Reinsurance*, 34 F.Supp.2d at 250) and federal questions regarding a federal treaty (the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208 (the "Convention")) and a federal statute (the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA")) (*Munich Reinsurance*, 223 F.3d at 160–61; *Mutual Fire*, 8 F.3d at 960; *Cologne Reinsurance*, 34 F.Supp.2d at 250). In *Cologne Reinsurance,* the court noted that resolution of the removed actions would require the arbitrators to look to state statutes, but decided that the issues were not "uncertain or difficult" and found that the arbitrators would be capa-

ble of applying the law. *Cologne Reinsurance*, 34 F.Supp.2d at 248. The insurance statutes at issue in *Cologne Reinsurance* were quite different from the one at issue in the Trust Action. In *Cologne Reinsurance*, case law was available to help interpret one statutory section at issue (40 P.S. § 221.32 regarding setoffs and counterclaims) and the other (40 P.S. § 221.21 regarding continuation of insurance coverage after entry of a liquidation order) did not require interpretation of broad terms, such as whether transactions are "fair and reasonable,"[47] as is required in interpreting the applicable section of the Insurance Company Holding Act, 40 P.S. § 991.1405(a)(1).

I do not agree that the Trust Action involves only ordinary contract and constructive trust issues, since the Trust Action requires interpretation and application of a state statute, concerning which there is, as yet, no existing state law to guide in that application. When state law is unsettled, it is often appropriate to allow the state court to resolve those issues. *See Stephen Smith, supra.*

For the foregoing reasons, I conclude that it is appropriate to exercise discretionary abstention under both 28 U.S.C. § 1334(c)(1) and the *Burford* abstention doctrine because the issues in the Trust Action involve an undeveloped area of Pennsylvania law which impacts the state's interest in the regulation of the insurance industry. Under principles of comity, it is appropriate to abstain and allow the Commonwealth Court to decide the Trust Action's state law issues. Therefore, the

---

*quire* that the bankruptcy court accept and exercise jurisdiction to determine the merits of the underlying dispute. Here, other, equally effective alternatives are available: discretionary abstention and equitable remand.

**47.** These are words, which, in their plain meaning, beg broad interpretation. *See Twp. of Derry, Dauphin County v. Swartz*, 21 Pa. Cmwlth. 587, 589, 346 A.2d 853, 855 (1975)("Since there is no definition in the Act, and the words are ones in common usage, we must take their common usage meaning.").

Trust Action will be remanded, in part, to the Commonwealth Court.[48]

### 2. Discretionary Abstention is not appropriate for the Emergency Petition.

■ The Emergency Petition presents a different situation, since it does not require the interpretation of any part of the state's statutory scheme for regulating insurance companies or present any novel or unsettled issues of state law. The Commissioner asserts that the Emergency Petition requires interpretation of the terms of the RIC Orders or 40 P.S. § 221.15(c). Although both require the Commissioner to take possession of an insurer's "assets," neither raises unsettled or novel issues requiring state court guidance.[49] Resolution of the Emergency Petition involves more "ordinary" issues of contract interpretation based upon the coverage, named assureds, and other provisions of the Lloyds Policies. These are not novel or unsettled issues of state law; the primary concern that led me to conclude that discretionary abstention is appropriate in the Trust Action, is not present here. The Emergency Petition is more like the cases of *Munich Reinsurance, Mutual Fire,* and *Cologne Reinsurance, supra,* in which courts found that remand and abstention were not appropriate for actions involving ordinary contract disputes and raising federal law issues (in this case, the extent to which the Lloyds Policies' proceeds are property of the Debtor's bankruptcy estate).

Likewise, the *Burford* abstention doctrine, discussed *supra,* is not applicable to the Emergency Petition. Although timely and adequate state court review of the Emergency Petition is available, this action does not meet either prong of the *Burford* abstention test. While the outcome of this matter may affect the amount of assets in the RIC liquidation proceeding (and in the Debtor's bankruptcy cases), it will not directly impact the state's regulation of insurers or the state's ability to establish rules for the orderly rehabilitation or liquidation of insolvent insurers. The Emergency Petition does not raise "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar;" nor would

---

**48.** There is no discord, under these circumstances, in returning a core matter to state court for disposition. A declaration that the Trust Action is core is no more than a reaffirmation, based upon an analysis of governing and otherwise persuasive decisional law, of one of the bankruptcy court's central responsibilities—to determine what property constitutes the bankruptcy estate. Yet, as the statutory and decisional law also make plain, the bankruptcy court may—and sometimes should—exercise the discretion given it by Congress to defer to other substantial and competing interests, such as the state's important interest in the regulation of insurance companies, including liquidation of insolvent insurers, by permitting a non-bankruptcy court to determine the nature of the debtor's interest as a matter of state law in certain property. Moreover, the relief I have fashioned still leaves to the New York Bankruptcy Court, *inter alia,* the resolution of any dispute over whether, after the Debtor's interest is defined under state law, that interest is § 541 property of the estate. *See* Section II.G.1., *infra.*

**49.** Although paragraph 5 of the May 29, 2001 Rehabilitation Order directs the Rehabilitor "...to take possession of the assets (including the assets of Reliance Lloyds), contracts and rights of action of Reliance, of whatever nature and wherever located, whether held directly or indirectly", I do not believe interpretation of that provision controls the outcome of this matter. The May 29, 2001 Rehabilitation Order does not define "Reliance Lloyds." The competing claims to the proceeds of the Lloyds Policies will most likely require analysis of the provisions of the Lloyds Policies and applicable principles of contract, insurance, and federal bankruptcy law.

allowing the bankruptcy court to decide this matter "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

The Commissioner argues that *Burford* abstention should be applied to the Emergency Petition, relying upon *Richardson v. Lloyds of London*, 896 F.Supp. 428 (E.D.Pa.1995). The dispute in *Richardson* centered around a directors and officers' liability policy issued by Lloyds of London (the "D & O Policy") that had been purchased by Corporate Life Insurance Company ("CLIC"). After being appointed liquidator of CLIC, the Pennsylvania Insurance Commissioner filed a suit in state court alleging that the purchase of the D & O Policy was a fraudulent transfer of CLIC's assets under Pennsylvania insurance law. The former officers and directors filed an action in federal court, seeking declaratory relief to compel Lloyds of London to use the proceeds of the D & O Policy to continue to pay their attorney fees in connection with the defense of the state court fraud action. The commissioner intervened in the federal action, seeking abstention. The *Richardson* court decided to abstain under *Burford*, concluding that (i) the state court could address adequately the claims raised in the federal court action; and (ii) that federal court review of the matter would disrupt the commissioner's attempts to marshal CLIC's assets and proceed with an orderly liquidation. *Richardson*, 896 F.Supp. at 433.

Although the Emergency Petition also involves competing claims to insurance policy proceeds, its similarities to *Richardson* end there. The claims in the *Richardson* federal action paralleled issues in an already-pending state court action. However, the Emergency Petition state court action was removed to federal court, so, here, there is no danger of duplicating or interfering with an ongoing state court action. The *Richardson* court decided that "significant state policy is involved in deciding whether CLIC's officers and directors should be permitted to use proceeds of a policy allegedly obtained by fraud when use of such funds could deplete the amount of money available to pay policyholders and creditors of an insolvent insurance company." *Richardson*, 896 F.Supp. at 433. But the *Richardson* court did not have competing federal bankruptcy policies to consider. Moreover, the disposition of the Emergency Petition in federal court will not disrupt the Commissioner's efforts to marshal RIC's assets for distribution to policyholders and creditors, and there is no interference with the state's overall regulation of insurers, which is required for *Burford* abstention.

 The Commissioner argues, additionally, that the reverse preemption provision of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), provides a basis for discretionary abstention.[50] I disagree. The Third Circuit has determined the following test for considering whether the reverse preemption provision of the McCarran–Ferguson Act applies to a particular matter:

> Under § 1012, state laws reverse preempt federal laws if (1) the state statute was enacted for the purpose of regulating the business of insurance, (2) the federal statute does not specifically relate to the business of insurance, and

---

**50.** 15 U.S.C. § 1012(b) provides, in pertinent part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. . . .

(3) the federal statute would invalidate, impair, or supersede the state statute. *Munich Reinsurance*, 223 F.3d at 160 (internal quotation marks and citations omitted).[51] The state and federal statutes that could be deemed in conflict in resolving the issues in the Emergency Petition action are the state statutes requiring the liquidator to take possession of the insurer's assets (40 P.S. § 221.20(c))[52] and granting the Commonwealth Court authority to enter orders to prevent the transfer or waste of the insurer's assets (40 P.S. § 221.5(a)), with the federal Bankruptcy Code, specifically 11 U.S.C. § 541, and related provisions.

The state liquidation statutes cited above were enacted for the purpose of regulating the business of insurance. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993).[53] The federal Bankruptcy Code is not (directly) related to the business of insurance.[54] Although the first two prongs of the McCarran–Ferguson reverse preemption test are met in this matter, allowing the bankruptcy court to determine the extent to which the insurance proceeds are property of the Debtor's bankruptcy estates will not "invalidate, impair or supersede" the state's regulatory scheme for the liquidation of insolvent insurers. As discussed previously, determination of the competing claims to the Lloyds Policies will not be determined by interpreting or considering a statute that is part of the state's regulatory scheme for insurance companies.

■ Although the record in this case is limited, it appears the Debtor is the actual owner of the Lloyds Policies. When the state law regarding the parties' property rights is not unsettled or difficult, the bankruptcy court is usually the most appropriate forum to determine competing claims to property of the bankruptcy estate. *Celotex*, 152 B.R. at 677. Although the Commissioner argues that the Commonwealth Court has exclusive jurisdiction of these matters, the same argument was rejected by the district court in *Cologne Reinsurance*. *Cologne Reinsurance*, 34 F.Supp.2d at 253.

Accordingly, I conclude that discretionary abstention is not warranted with respect to the Emergency Petition.

### E. *Equitable Remand.*

■ The Commissioner also argues that the State Court Actions should be remanded pursuant to 28 U.S.C. § 1452(b), which permits a court to remand "on any

---

**51.** In *Munich Reinsurance,* the court found that McCarran–Ferguson did not effect reverse preemption of either the Convention Act or the Federal Arbitration Act. *Munich Reinsurance,* 223 F.3d at 161.

**52.** The May 29, 2001 Order was entered under 40 P.S. § 221.15(c) and the October 3, 2001 was entered under 40 P.S. § 221.20(c). Both rehabilitations and liquidations of insurers come under Article V of the Insurance Department Act of 1921, as amended (40 P.S. §§ 221 et seq.).

**53.** In *Fabe,* the Supreme Court held that the purpose of an Ohio statute regarding the distribution of a liquidated insurer's assets was: identical to the primary purpose of the insurance company itself: the payment of claims made against policies...The Ohio statute is enacted "for the purpose of regulating the business of insurance" to the extent that it serves to ensure that, if possible, policyholders ultimately will receive payment on their claims. That the policyholder has become a creditor and the insurer a debtor is not relevant. *Fabe,* 508 U.S. at 505, 113 S.Ct. 2202. Similarly, the purpose of the above-cited Pennsylvania statutes is to collect and protect a liquidating insurer's assets, ultimately for distribution to policyholders and others.

**54.** See, n. 5, *supra.*

equitable ground" a cause of action that has been removed to the bankruptcy court. To determine if the equities weigh in favor of remanding an action to state court, courts have considered the following seven factors:

1. the effect of remand on the efficient administration of the bankruptcy estate;
2. the extent to which issues of state law predominate;
3. the difficulty or unsettled nature of applicable state law;
4. comity;
5. the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;
6. the existence of the right to a jury trial; and
7. prejudice to the involuntarily removed defendants.

*Grace Community*, 262 B.R. at 629, n. 6 (citing *RBGSC*, 253 B.R. at 381–82; *In re Raymark, Industries, Inc.*, 238 B.R. 295, 299 (Bankr.E.D.Pa.1999)). The last two factors are not applicable to the Trust Action or the Emergency Petition.

■ Considering these factors in relation to the Trust Action, I conclude that equitable remand also provides a basis for returning that action to the Commonwealth Court. For the reasons discussed in greater detail in Section II.D.1. above, factors two, three and four weigh heavily in favor of remanding the Trust Action, so that the state court can interpret and apply the Insurance Holding Company Act. The Act is also part of the state's overall plan for regulation of the insurance industry, which has been recognized as an area of important state interest.[55] While considerations of the first and fifth factors may tip in favor of returning the Trust Action to the state court, the factors supporting remand, on balance, outweigh those that would support keeping the Trust Action in bankruptcy court for administrative convenience.

■ Applying the five applicable equitable remand factors to the Emergency Petition brings the opposite result. There is no indication that the state law issues that arise in the Emergency Petition are unsettled or difficult, so the second, third and fourth factors do not carry much weight for remand. Resolution of the Emergency Petition may impact both the federal bankruptcy estate and RIC's state liquidation proceeding, but I do not find sufficient reason to defer to the state court to resolve this matter.

Finally, another factor to consider in the context of equitable remand is judicial economy. Although I have concluded that the Trust Action should be returned to the Commonwealth Court, both State Court Actions need not be heard in the same forum simply because both involve the Debtor and the Commissioner. The issues arising in the Emergency Petition are quite different from those arising in the Trust Action. Therefore, judicial economy is not better served by remanding the Emergency Petition to the Commonwealth Court. Accordingly, the Emergency Petition will not be remanded pursuant to 28 U.S.C. § 1452(b).

### F. *Transfer of the Residual Trust Action Issues and Emergency Petition.*

■ Because a residual part of the Trust Action and all of the Emergency Petition will remain in federal bankruptcy court, I will now consider the Debtor's Venue Motions. The Debtor has asked that the removed adversary proceedings be transferred to the home bankruptcy

---

55. *See* n. 40 and 41, *supra.*

court pursuant to 28 U.S.C. § 1412, which provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

The language of § 1412 is permissive, not mandatory, and the decision to transfer is subject to the broad discretion of the court. *Independent Stationers, Inc. v. Vaughn,* 2000 WL 1449854, *2 (S.D.Ind. 2000); *Krystal Cadillac–Oldsmobile–GMC Truck, Inc. v. General Motors Corp.,* 232 B.R. 622, 628 (E.D.Pa.1999). There are a number of factors a court may weigh in making its decision regarding transfer, including:

1. Relative ease of access to sources of proof.

2. Availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining those witnesses' attendance.

3. Enforceability of a judgment if one is obtained.

4. Relative advantages and obstacles to fair trial.

5. Local interest in having local controversies decided at home.

6. Trial in state the law of which will govern the action.

7. The proximity of the debtor and creditors of every kind to the court.

8. The location of the assets.

9. The economic administration of the estate and the economic necessity

for ancillary administration if liquidation should result.

*Krystal,* 232 B.R. at 628.

■ Many of the above factors have little or no bearing on the present case. The Debtor's principal place of business is in the home bankruptcy court's district and, therefore, it would be more convenient for witnesses and for access to documents to try the residual matters there.[56] The inconvenience to the Commissioner between attending hearings in New York or Philadelphia is not significant. Indeed, the Commissioner has already participated in the home court. The sixth factor does not apply to the residual Trust Action issues, since I have decided that the undeveloped state law issues will be returned to the Commonwealth Court. Although the Emergency Petition involves application of state law (as discussed above), there are no novel or unsettled issues requiring the action to be heard in Pennsylvania.

The most important of the above factors, however, is whether the transfer would promote the economic and efficient administration of the estate. *Independent Stationers,* 2000 WL 1449854 at *3. In *Krystal,* the court stated that a "presumption has developed that civil proceedings should be tried in the 'home' court, namely the court where the bankruptcy case itself is pending." *Krystal,* 232 B.R. at 627.[57] Because the New York Bankruptcy Court, as the home court, is familiar with the Debtor's entire chapter 11 efforts, it is more efficient for any residual Trust Action issues and the Emergency Petition to be resolved there, rather than here. For this court to retain any residual Trust Action

---

56. The Debtor alleges that the Commissioner's staff responsible for day-to-day operation of RIC is also located mostly at RIC's offices in New York City. This was not disputed by the Commissioner.

57. This presumption can be distinguished from the decisions promoting "automatic" transfer to the home court, which were criticized in the *Harnischfeger* case, 246 B.R. at 436, n. 42.

issues or the Emergency Petition for resolution would keep open yet a third forum (battleground), further depleting unnecessarily assets of both the Debtor and RIC. Therefore, the Trust Action issues and Emergency Petition will be transferred to the New York Bankruptcy Court.

### G. *Relief Granted.*

#### 1. *The Trust Action.*

█ In her Remand Motion, the Commissioner did not specifically request relief from the automatic stay, but asks that this court abstain and remand the State Court Actions to the Commonwealth Court and requests that this court grant "such other and further relief as this Court deems necessary and just." Other courts have found that a request for relief from the stay to allow resolution of issues in state court is implicit in an abstention motion. *Pursifull v. Eakin,* 814 F.2d 1501, 1505 (10th Cir.1987). I agree that implicit in the Commissioner's Remand Motions is a request for relief from the automatic stay of Bankruptcy Code Section 362.[58] I will grant such relief in the Trust Action for determination by the Commonwealth Court of: (1) whether the Tax Allocation Agreement and/or the Debtor's actions under the Tax Allocation Agreement violate Pennsylvania statutes regulating insurers and affiliated holding companies; (2) whether under Pennsylvania law the disputed cash should be subject to a constructive or resulting trust; and (3) whether interim injunctive relief regarding the disputed cash should be granted.

For the reasons already given, the Commonwealth Court should have the latitude to protect and control the alleged "res" pending that court's disposition of the Trust Action. To require the parties to resort to the New York Bankruptcy Court for interim injunctive relief would create a duplication of judicial resources. For example, one of the considerations in evaluating a request for injunctive relief is the likelihood of success on the merits of the claim. *See The Nutrasweet Co. v. Vit-Mar Enterprises, Inc.,* 176 F.3d 151, 153 (3d Cir.1999). The Commonwealth Court is well able to address these matters through the time of disposition. However, I cannot now predict what will be the state of the Debtor's chapter 11 case at the time of the ultimate disposition of the Trust Action by the Commonwealth Court. Therefore, it is appropriate to require that the parties return, as their respective needs and interests may dictate, to the New York Bankruptcy Court for relief in connection with the enforcement of the disposition of the Trust Action by the Commonwealth Court.[59]

---

**58.** Whether to terminate, modify, condition, or annul the bankruptcy stay under § 362(d) is within the discretion of the bankruptcy court. *See Matter of Holtkamp,* 669 F.2d 505 (7th Cir.1982); *In re Shariyf,* 68 B.R. 604 (E.D.Pa.1986); *In re Colonial Center, Inc.,* 156 B.R. 452, 459 (Bankr.E.D.Pa.1993). Whether an unsecured creditor should be granted relief from the stay to continue a state court proceeding was considered by the court in *In re Hohol,* 141 B.R. 293 (M.D.Pa.1992), which said:

> There is no rigid test for determining when an unsecured creditor...has established cause to warrant relief from the automatic stay. Instead the cases recognize that the bankruptcy court's exercise of discretion in resolving motions for relief for "cause" must appropriately consider the policies underlying the Bankruptcy Code as well as the competing interests of the creditor, debtor, and other parties in interest. Each request for relief for "cause" under § 362(d)(1) must be considered on its own facts.

*Hohol,* 141 B.R. at 297 (citations omitted).

**59.** *See OMNA Medical Partners, Inc. v. Carus Healthcare, P.A. (In re OMNA Medical Partners, Inc.),* 257 B.R. 666, 669 (Bankr.D.Del. 2000)(Court exercised its discretion to abstain from hearing a suit that was originally brought in a Texas state court to enjoin the

The Debtor's Venue Motion for the Trust Action will be granted, in part. Adversary No. 01–558 will be transferred to the New York Bankruptcy Court for consideration of any residual Trust Action issues, including but not limited to issues such as whether the debtor's interest, once defined by the state court, is § 541 property of the estate, the Commissioner's request for permanent injunctive relief, or enforcement of any state court order obtained by the Commissioner with respect to the remanded issues.

### 2. *The Emergency Petition.*

For the reasons stated above, the Commissioner's Remand Motion for Adversary Proceeding No. 01–559 (regarding the Emergency Petition) will be denied and the Debtor's Venue Motion in that adversary proceeding will be granted.

debtor, as the secured party, from conducting a public sale of its collateral; however, the court required the parties to return to bankruptcy court for enforcement of the debtor's rights if the Texas court determined that the collateral at issue was the debtor's property.)