### In re MEDICAL CARE MANAGEMENT COMPANY,

and

### In re Access Health Systems, Inc., Debtors.

Nos. 301–14089, 301–14090.

United States Bankruptcy Court, M.D. Tennessee.

Jan. 2, 2003.

David E. Lemke, Esquire, Eric B. Schultenover, Esquire, Waller Landsen Dortch & Davis, PLLC, Nashville City Center, Nashville, TN, for Commissioner Anne P. Pope and Special Liquidator Courtney Pearre.

James R. Kelley, Esquire, David G. Thompson, Esquire, Neal & Harwell, Nashville, TN, for Debtors Medical Care Management Company and Access Health Systems, Inc.

Edwin M. Walker, Esquire, Garfinkle, McLemore & Walker, PLLC, Nashville, TN, for Official Committee of Unsecured Creditors Debtor Medical Care Management Company.

Craig V. Gabbert, Jr., Esquire, David P. Cañas, Esquire, Harwell, Howard, Hyne, Gabbert & Manner, PC, Nashville, TN, for Official Committee of Unsecured Creditors for Debtor Access Health Systems, Inc.

## MEMORANDUM OPINION

MARIAN F. HARRISON, Bankruptcy Judge.

This case is before the Court upon the Motion for Mandatory Abstention Pursuant to 28 U.S.C. § 1334(c)(2), or in the Alternative for Permissive Abstention Pursuant to 28 U.S.C. § 1334(c)(1) and the Motion for Relief from the Automatic Stay of 11 U.S.C. § 362 as Necessary to Proceed in State Court Action, both filed by Anne P. Pope, Commissioner of the Tennessee Department of Commerce and Insurance (hereinafter "Commissioner"). The debtors, Medical Care Management Company (hereinafter "MCMC") and Access Health Systems, Inc. (hereinafter "AHS"), and the unsecured creditors committees of the debtors oppose the motions. Also before the Court is the debtors' motion asking the Court to take judicial notice that its files contain a proof of claim and a request for administrative expenses from the Tennessee Department of Labor and Workforce Development, which claim and request were subsequently withdrawn.

Based on the testimony, the pleadings, and the arguments of counsel, the Court finds as follows: (1) the Commissioner's motion for abstention is premature and should be denied; (2) the motion for relief from the stay for cause pursuant to 11 U.S.C. § 362(d)(1) should be granted to the extent set forth herein; and (3) the debtors' motion asking the Court to take judicial notice of the claim and request filed and withdrawn by the unrelated state agency should be granted. The following represents the Court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

## I. BACKGROUND

The Commissioner heads the Department of Commerce and Insurance of the state of Tennessee and is charged under Title 56 of the Tennessee Code with the regulation and oversight of insurance companies operating in Tennessee. These statutory responsibilities extend to the regulation and operation of health maintenance organizations (hereinafter "HMOs") operating in Tennessee pursuant to T.C.A. § 56–32–202, et seq.

Tennessee Consolidated Case Network (hereinafter "TCCN") is a non-profit public benefit corporation, incorporated in the state of Tennessee and holding a certificate of authority from the Commissioner to operate as a Tennessee domestic HMO. TCCN previously contracted with the state's TennCare Bureau which operates TennCare, the state's alternative to the Medicaid system, under the direction of the Department of Finance and Administration. Under the Contractor Risk Agreement with TennCare, TCCN was to provide medical services to indigent and other uninsurable enrollees as an HMO. Pursuant to its contract, the state was to pay TCCN an amount each month (capitation rate) for each individual enrolled by TCCN, and TCCN was to provide the necessary medical care to its enrollees.

TCCN had only one employee, its president. MCMC and AHS were closely aligned with TCCN and essentially operated the HMO, according to the Chancery Court's "Final Order Appointing Commissioner for Purposes of Liquidation ...." Specifically, pursuant to the Agreement for Management Services between MCMC and TCCN, MCMC managed TCCN's operations and supplied or arranged for all of the personnel, physical space, and equipment that was required to administer and carry out TCCN's functions as an HMO. MCMC also provided the accounting, legal, and general administrative services that were required by TCCN pursuant to the management agreement. In addition,

MCMC maintained records related to TCCN's business. Debtor AHS, which is the parent company of MCMC, managed the affairs of MCMC.

As a result of varied state concerns over the financial viability of TCCN, Courtney Pearre was appointed Supervisor for TCCN under the Insurers Rehabilitation and Liquidation Act, T.C.A. § 56–9–101, et seq., pursuant to the Commissioner's Notice of Administrative Supervision (hereinafter "Supervision Notice"), dated May 10, 2000, and T.C.A. § 56–9–503. The Supervision Notice was extended by agreement on September 20, 2000, and again on June 19, 2001, and Mr. Pearre served as Supervisor of TCCN from May 10, 2000, until approximately October 18, 2001. As Supervisor, Mr. Pearre was charged with the responsibility of reviewing and approving all requests for disbursements. Specifically, the Supervision Notice prohibited TCCN from making any disbursements, withdrawing any of its bank accounts, and, in general, transferring any of its property or assets, "without the prior written approval of the Commissioner or the Commissioner's appointed Supervisor." In addition, the Supervision Notice provided for a safety net—the state guaranteed all payments to providers from May 10, 2000, to February 1, 2001, and afterwards extended its risk band to guarantee half of the payments owed by TCCN to providers. These guarantees were instituted to ensure that providers would not abandon the plan threatening the loss of health care to enrollees. According to the Commissioner's witnesses, the estimated amounts owed by the state under the risk band totaled approximately $16 million and the state's obligations under the safety net are approximately $7 million.

On September 19, 2001, Deputy Commissioner of Finance and Administration, Mark Reynolds, gave written notice to TCCN of the state's intent to terminate TCCN's contract absent proof of immediate contractual compliance. Following an exchange of information, on October 16, 2001, Deputy Commissioner Reynolds gave written confirmation to TCCN that its contract would end October 31, 2001. On October 16, 2001, the Commissioner alleges a request was made to AmSouth Bank to transfer $5.7 million from TCCN to debtor MCMC. Neither Mr. Pearre nor the Commissioner, whose consent was required for any transfer of funds, were aware of this request, transfer, or "attempted transfer" (the Commissioner's terminology), until after the fact, despite the language of the Supervision Notice.

On October 17, 2001, the Commissioner applied to the Chancery Court of Davidson County for an order of seizure of TCCN. That same date, the Chancery Court entered a temporary restraining order and mandatory injunction stopping disbursement of the funds by AmSouth Bank. Thereafter, on October 18, 2001, the Chancery Court entered an order granting the Commissioner's Application for an Order of Seizure of TCCN. On November 2, 2001, the Chancery Court entered the Final Order Appointing Commissioner for Purposes of Liquidation of Respondent Tennessee Coordinated Care Network and Permanent Injunction and a separate Order Continuing Injunctive Relief regarding the $5.7 million, which Order was approved for entry by counsel for the debtor, MCMC. Mr. Pearre was then appointed Special Deputy Liquidator for TCCN on November 2, 2001.

On November 14, 2001, the Commissioner filed a Petition to Recover Preferential and Fraudulent Transfer against MCMC and AHS in the Chancery Court of Davidson County, under T.C.A. § 56–9–315 (fraudulent transfer) and T.C.A. § 56–9–317 (preferential transfer). At the hearing

of the matter in this Court, the Commissioner offered an exhibit which was identified as an amendment to the chancery court complaint, adding additional theories of conversion and constructive trust over the $5.7 million still frozen by AmSouth Bank. The proof showed the Commissioner's intent to file this amendment if the automatic stay is lifted or if this Court abstains.

Following the filing of the chancery court lawsuit, the debtors filed this voluntary petition for relief under Chapter 11 on December 17, 2001. This case was originally jointly administered and has now been separated fully with the appointment of separate trustees for the debtors. The Commissioner has not filed a proof of claim in either case. However, as stated above, an unrelated department did file a proof of claim and a request for payment of administrative expenses on March 22, 2002, which claim and request were later withdrawn.

## II. THE PARTIES' POSITIONS

The Commissioner argues that this Court should abstain in favor of the chancery court litigation because: (1) under the Eleventh Amendment to the Constitution of the United States, the state is not subject to this Court's jurisdiction absent its consent, thus triggering mandatory abstention; (2) under the McCarran–Ferguson Act, bankruptcy jurisdiction is reverse-preempted by Tennessee's comprehensive regulatory scheme for supervision over and liquidation of insurance companies contained in the Insurers Rehabilitation and Liquidation Act (T.C.A. § 56–9–101, et seq.), particularly and more specifically, those sections of the Act setting forth the procedures for liquidating insolvent insurance companies; (3) other elements of mandatory abstention under 28 U.S.C. § 1334(c)(2) are present here; and (4) in any event, the case for permissive abstention under 28 U.S.C. § 1334(c)(1) is compelling. Finally, the Commissioner argues in the alternative that this Court should lift the stay pursuant to 11 U.S.C. § 362, for cause, cause being essentially the same arguments she utilizes to support her motion for abstention.

In response, the debtors and the unsecured creditors committees assert that neither the Eleventh Amendment nor the McCarran–Ferguson Act is implicated, that abstention, whether mandatory or permissive, is inappropriate, that this Court has exclusive jurisdiction to determine what is property of the estate, and that the state waived its sovereign immunity and consented to the exercise of this Court's jurisdiction by the filing of an unrelated proof of claim and a request for payment of administrative expenses by an unrelated state agency, which claim and request were later withdrawn.[1] Finally,

---

1. Initially, the Court grants the debtors' motion to take judicial notice of the filing of a claim for $71.03 and request for payment of administrative expenses of $10.87 by the Tennessee Department of Labor and Workforce Development, Bureau of Unemployment Insurance, which claim and request were later withdrawn. While granting the debtors' motion to take judicial notice, these documents have no relevance to the present proceedings. Before a claim can constitute a waiver of sovereign immunity or a consent to jurisdiction on other grounds, the claim must arise out of the same transaction or occurrence as the dispute over which the bankruptcy court's exercise of jurisdiction is sought by the debtors. E.g., 11 U.S.C. § 106(b) (waiver of sovereign immunity); In re Beasley–Gilbert's Inc., 285 F.Supp. 359, 361 (S.D.Ohio 1968) (claim filing "does not constitute implied consent to be sued on an alleged cause of action arising out of a different subject matter"). See also In re Carnell Constr. Corp., 424 F.2d 296, 298 (3d Cir.1970). Here, the claim and the request, totaling less than $100, are not only unrelated to the dispute herein, they were not even filed by the same state agency. Accordingly, they

the debtors and unsecured creditors argue that this is in essence claims litigation, that a transfer of this fund to the debtors has already occurred, and that the Commissioner is seeking through the state court litigation to raise its claimant status from unsecured to secured in this bankruptcy at the expense of 650 other unsecured creditors who have no ability to protect their interests in the state court litigation.

The Court will now address the specific arguments raised.

## III. DISCUSSION

### A. Abstention

 All the Commissioner's arguments regarding abstention are premature. There is no ongoing litigation in this Court from which this Court can abstain. Neither side in this matter has made any effort to bring the "dispute" over ownership of the $5.7 million account to a head. The Commissioner has not filed a claim, no declaratory judgment action or other proceeding is pending here, and the disputed funds are apparently still held by AmSouth Bank. The only litigation pending in this Court is the Commissioner's alternative motion for relief from stay pursuant to 11 U.S.C. § 362. While there is nothing pending from which this Court can abstain, certainly, many of the Commissioner's arguments regarding abstention, jurisdiction, and preemption are relevant to the motion for relief, and the Court will address them in that context.

### B. The Commissioner's Motion for Relief from Stay

In addressing the Commissioner's request for stay relief, the Court must initially decide whether it has the authority to grant relief from the stay to permit the Chancery Court of Davidson County to

have no bearing whatsoever on these proceedings.

decide who owns the disputed funds. The debtors and unsecured creditors committees argue that the bankruptcy court has exclusive and non-delegable jurisdiction over property of the estate under 28 U.S.C. § 1334(e) and that, therefore, there can be no finding of cause justifying relief from the stay. In contrast, the Commissioner, in reliance on *Noletto v. Nationsbanc Mortgage Corp. (In re Noletto)*, 244 B.R. 845, 852–853 (Bankr.S.D.Ala.2000), draws a distinction between the distribution of estate property over which the bankruptcy court maintains exclusive, nondelegable jurisdiction under 28 U.S.C. § 1334(e) and the determination of what is or is not property of the debtor under state law. According to *Noletto*, jurisdiction to decide whether property is owed by a bankruptcy estate or some other person or entity is shared jurisdiction. To hold otherwise would, according to *Noletto*, abrogate another section of the same jurisdictional statute, 28 U.S.C. § 1334(d), which permits district courts (and thus bankruptcy courts) to abstain when abstention is the most appropriate—when ownership is determined by state law. *Noletto* has been relied upon by the Sixth Circuit in *Blachy v. Butcher*, 221 F.3d 896, 909 (6th Cir.2000), for the proposition that a bankruptcy court can share its jurisdiction under 28 U.S.C. § 1334(e) over selected issues.

Whether or not "cause" can exist under 11 U.S.C. § 362 for lifting the stay to allow a state court to determine property ownership has been addressed specifically by the Sixth Circuit in the divorce context, an area in which states have a keen interest, much like their interest in the regulation of insurance companies. (*See* discussion of state interests, *infra.*) In *White v. White (In re White)*, 851 F.2d 170, 173–174 (6th

Cir.1988), the Court held that a bankruptcy court could suspend its jurisdiction in favor of ongoing state proceedings to decide the debtor's interest in the marital estate. As the Court stated:

The Bankruptcy Code does not define a debtor's interest in property; the answer to that question must be made after reference to state law.

. . . .

The 1984 amendments to the Bankruptcy Code have not rendered it a self-contained mechanism to operate entirely without reference to state law.[2] We therefore find no abuse of discretion in the bankruptcy court's decision to defer to the traditional and expert judgment of the divorce court for the State of Ohio for the sole purpose of deciding interests in the marital estate of the debtor husband and wife. The debtor's argument simply proves too much in urging that a bankruptcy court may never give up its jurisdiction for any reason, even for a limited purpose. The provisions for lifting the stay found in § 362(d) should be deemed to apply in these circumstances for the limited purpose of allowing the state court to exercise its exclusive domestic relations authority, including decisions concerning fair allocation of the marital estate.

In concluding, the court in *White* accepted the bankruptcy court's reservation of "its 'exclusive jurisdiction over property of the Debtor ... when the state court defines what is property of the debtor.'" *Id.* at 174.

Thus, in certain circumstances, "cause" for lifting the automatic stay exists under 11 U.S.C. § 362(d) to allow state courts to adjudicate property rights under state law. Since both the Commissioner's chancery court complaint and her proposed amended complaint seek a finding that the $5.7 million in the AmSouth account was not validly transferred to the debtors and is property of the TCCN estate which is now controlled by the liquidator under the Insurers Rehabilitation and Liquidation Act, T.C.A. § 56–9–101, et seq., the issue presented is whether cause, similar to that found by the Sixth Circuit in *White*, exists for lifting the stay under 11 U.S.C. § 362(d).

The Commissioner's arguments based upon the McCarran–Ferguson Act and the principles of comity inherent therein support a finding of cause under 11 U.S.C. § 362(d).

### 1. The McCarran–Ferguson Act

The Commissioner argues that the McCarran–Ferguson Act reverse-preempts the Bankruptcy Code and requires that the Chancery Court of Davidson County be permitted to exercise its jurisdiction over the Petition to Recover currently pending in state court. McCarran–Ferguson Act at 15 U.S.C. § 1012(b) provides in relevant part:

No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

**2.** Prior to the 1984 amendments, the Sixth Circuit had sanctioned stay relief so that property in a divorce case could be divided by the state court. In *Wasserman v. Washington (In re Washington)*, 623 F.2d 1169 (6th Cir. 1980), the Sixth Circuit held under previous law that when a state divorce court had already taken *in rem* jurisdiction over the marital estate, the divorce court had exclusive jurisdiction over the *in rem* proceeding because it had first asserted jurisdiction. *Id.* at 1172. That rule was abrogated by the enactment in 1984 of 28 U.S.C. § 1334. *White,* 851 F.2d at 172.

The Commissioner argues that the state proceeding involving the liquidation of TCCN and the alleged transfer and ownership of the disputed funds in the Chancery Court under the authority granted under the comprehensive regulatory scheme governing insurance companies and their rehabilitation and liquidation is precisely the type of litigation that should reverse-preempt the application of the Bankruptcy Code, since the Bankruptcy Code does not purport to regulate insurance and, indeed, specifically excludes insurance companies from coverage under the Code.[3] Certainly, to the extent, if any, that the McCarran–Ferguson Act applies here, the concept of reverse-preemption presents even greater cause for lifting the stay than in the divorce context since Congress has specifically eliminated federal interference where the Act applies. This deference to state regulation was present long before McCarran–Ferguson was enacted in 1945:

> For more than a century, the regulation of domestic insurance companies and, in particular, the administration of insolvency proceedings for domestic insurance companies has been governed by state law. *See Paul v. Virginia*, [8 Wall. 168,] 75 U.S. 168[, 19 L.Ed. 357] (1868) (holding that the "business of insurance" did not constitute "commerce"). Although the United States Supreme Court later overruled its decision in *Paul* on the ground that the commerce clause of the U.S. Constitution empowered Congress to regulate insurance companies as part of interstate commerce, *see United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533[, 64 S.Ct. 1162, 88 L.Ed. 1440] (1944), by enacting the McCarran–Ferguson Act, Congress chose not to exercise such power and to defer regulation of insurance companies to the states. *See* McCarran–Ferguson Act, 15 U.S.C. § 1012(a) (1945) ("[the] business of insurance ... shall be subject to the laws of the several states"). The McCarran–Ferguson Act represents a strong federal policy of deference to the states in matters relating to insurance.

Harvey R. Miller & George A. Davis, *The Interplay of Insurance Companies and the Bankruptcy Code*, 659 PLI/Comm 247, 310 (1993).

■ Any analysis of the McCarran–Ferguson Act must begin with *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), in which the Supreme Court set forth the prerequisites for reverse-preemption as identified in the statute: (1) the federal statute does not specifically relate to insurance, (2) the state statute was enacted to regulate the business of insurance, and (3) the federal statute would invalidate, impair, or supercede the statute. *Id.* at 500–01, 113 S.Ct. at 2207–08. Since it is clear that the Bankruptcy Code does not specifically relate to the business of insurance, these questions are narrowed to two: (1) whether the state statute in question, T.C.A. § 56–9–101, et. seq., and its specific provisions implicated here[4] were enacted

---

**3.** In apparent recognition of the states' interest in regulating insurance companies, the Bankruptcy Code specifically excludes domestic insurance companies from becoming debtors in bankruptcy. 11 U.S.C. § 109(b)(2).

**4.** As noted in *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585 (5th Cir.1998), the *Fabe* opinion does not make clear whether courts may look to the state statute as a whole

to determine the extent of its preemptive power under the McCarran–Ferguson Act or whether parsing of the specific provisions of the statute at issue is required. *Munich*, 141 at 592. Despite a split in authority as to how *Fabe* should be interpreted on this point, the Court has examined Tennessee's Insurers Rehabilitation and Liquidation Act in its entirety and has also parsed those sections specifically implicated in making its determination.

to regulate the business of insurance, and (2) whether application of the Bankruptcy Code would "invalidate, impair, or supercede" the state Insurers Rehabilitation and Liquidation Act.

### a. The Insurers Rehabilitation and Liquidation Act, T.C.A. § 56–9–101, et seq., and the Specific Portions of that Act Implicated Here Were Designed "to Regulate the Business of Insurance"

 According to the Supreme Court in *Fabe*, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449, and its earlier opinion, *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969), if a state law protects or regulates either directly or indirectly, the relationship between an insurer and its policyholders, the state law "regulates the business of insurance" for purposes of the McCarran–Ferguson Act. Because the Ohio rehabilitation and liquidation statute examined in *Fabe* was designed to ensure ultimately that its policyholders and their claims were protected, that the bargained for risk transfer occurred, and that insurance contracts were honored "despite the insurance company's intervening bankruptcy," the Court found that even those portions of the Ohio act providing for liquidation were designed to regulate the business of insurance. *Fabe*, 508 U.S. 491, 503–04, 113 S.Ct. 2202, 2209, 124 L.Ed.2d 449. Accordingly, in *Fabe*, the Court held that the federal priority scheme relating to government claims was reverse-preempted by the Ohio priority statute.[5] *Id.* at 508–09, 113 S.Ct. at 2212.

Following *Fabe*, courts have continued to ask whether the purpose of the state insurance statute in question is to protect the relationship between the insurer and policyholder under their contract for risk transfer in determining whether the state law in question regulates the business of insurance. Noting the potential reach of *Fabe's* holding, the Sixth Circuit in *Int'l Ins. Co. v. Duryee*, 96 F.3d 837 (6th Cir. 1996), stated that "[i]t is not clear . . . how far its holding extends" and that arguably any law even remotely benefitting policyholders could meet this test. *Id.* at 839. On the specific facts of the case before it, however, the court in *Duryee* found lacking the connection between policyholders and an Ohio statute requiring revocation of the license of any foreign insurer who attempts to remove a case filed against it in the Ohio court to federal court. *Id.* at 840. The Court held that a federal constitutional challenge to the statute could proceed in federal court because the clear purpose of the Ohio statute was only to provide access to a convenient forum for those suing foreign insurance companies. *Id.* As the Court stated:

> [I]t is evident that § 3927.05 was not enacted so much "for the purpose of regulating the business of insurance" as for the parochial purpose of regulating a foreign insurer's choice of forum and punishing the insurer for going into federal court. The McCarran–Ferguson Act was not meant to protect a statute so tangentially related to insurance from the general rule of federal law supremacy. ***If any statute escapes Fabe's broad definitional construct, it is the statute as issue here.***

*Id.* at 840 (emphasis supplied).

In *Duryee*, the statute in question did not appear to be part of a comprehensive

5. In contrast, the Supreme Court in *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668, had found that the Arizona statute permitting the insurance commissioner to approve a merger of insurance companies was focused upon the protection of stockholders, not the policyholders, and, therefore, the SEC's efforts to undo the merger were not reverse-preempted by the McCarran–Ferguson Act.

statutory scheme designed to ensure the performance of insurance contracts through the monitoring of companies, their finances, the rehabilitation of companies, or the orderly liquidation of companies as is presented here. Many of the cases following *Fabe*, which find the McCarran–Ferguson Act applicable, have done so in the context of a complex state statutory scheme governing rehabilitation and liquidation of insurers, much like Tennessee's Insurers Rehabilitation and Liquidation Act.[6]

*Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, involved just such a comprehensive state statute, the Oklahoma Uniform Insurers Liquidation Act. This Act vested jurisdiction over all insurers' insolvency proceedings in one state court, it authorized the state court to enjoin any actions interfering with the liquidation process, and it empowered the state court "to decide all issues relating to the disposition of an insolvent insurance company's assets, including whether any given property is part of the insolvent estate in the first place." *Id.* at 592–93.

According to the Court, the purpose of this jurisdictional scheme and orderly liquidation process was to prevent dissipation of the company's assets by requiring the liquidator to litigate in one forum and to minimize the risk of conflicting decisions and unequal treatment of claimants. *Id.* at 593. In short, the entire Oklahoma Act, including its jurisdictional provisions, were, under *Fabe*, "reasonably necessary to further the goal of protecting policyholders," even if in the process others benefitted from the orderly legislative scheme. *Id.* at 594. Thus, the purpose of the Act and its jurisdictional scheme was the "regulation of the business of insurance." *Id. In accord, Davister Corp. v. United Republic Life Ins. Co.*, 152

F.3d 1277, 1281 (10th Cir.1998) (Utah's insurance liquidation statute requiring consolidation of all claims against insolvent companies was designed to protect policyholders for the reasons stated in *Munich*, even though others might also benefit from the liquidation process); *U.S. Fin. Corp. v. Warfield*, 839 F.Supp. 684 (D.Ariz.1993) (purpose of Arizona statute guaranteeing Arizona Superior Court exclusive jurisdiction over insurer liquidation proceeding designed to protect policyholders by providing a single forum for the marshaling of all assets and claims for the conservation of assets by avoiding litigation by receivers in multiple courts and by ensuring that Arizona's comprehensive statutory scheme was interpreted by the Arizona courts); *Corcoran v. Universal Reinsurance Corp.*, 713 F.Supp. 77 (S.D.N.Y.1989) (removal statute interfered with New York's comprehensive insurers liquidation scheme which was designed to protect policyholders by centralizing the liquidation and marshaling of assets into a unified proceeding in the state court).

In a recent case, *Covington v. Sun Life of Canada (U.S.) Holdings, Inc.*, 2000 WL 33964592, 2000 U.S. Dist. Lexis 20902 (S.D.Ohio May 17, 2000), the District Court for the Southern District of Ohio analyzed each of these cases and distinguished them from the Sixth Circuit's decision in *Duryee, supra. Covington*, at *8, 2000 U.S. Dist. Lexis 20902, at *22. In *Covington*, the plaintiff liquidator sued several defendant insurance companies in the Franklin County Court of Common Pleas under the Ohio statutory scheme to recover fraudulent and preferential transfers allegedly made to them by another insurance company in liquidation, much like the litigation now pending in the

---

**6.** Indeed, *Fabe* dealt with the priority scheme of Ohio's insurers liquidation statute.

Chancery Court of Davidson County. The defendants removed the case to district court on the basis of diversity. The Ohio statute at issue gave exclusive jurisdiction to the Ohio state court over the liquidation of insurance companies in an effort to lower costs and provide expertise and uniformity over such matters, and the liquidator moved to remand on that basis. The district court held that this jurisdictional grant had as its purpose the protection of policyholders. *Covington*, *8, 2000 U.S. Dist. Lexis 20902, at *23. In contrast to the comprehensive liquidation scheme, the Ohio statute in question in *Duryee* simply prevented all foreign insurance companies from removing litigation to federal court, regardless of the nature of the case. *Covington*, *8, 2000 U.S. Dist. Lexis 20902, at *22. Further, *Duryee* did not involve a comprehensive regulatory process designed to protect policyholders by maximizing assets and minimizing costs to insolvent companies. In summary, *Duryee* considered a generic jurisdictional grant with no clear purpose other than to establish a convenient forum, while *Munich, Davister, U.S. Fin. Corp.*, and *Corcoran* dealt with a jurisdictional grant to a state court having the clear purpose of protecting policyholders from waste, inconsistent rulings, and a disorderly non-uniform process. *Covington*, *8, 2000 U.S. Dist. Lexis 20902, at *23–24.

In each of these cases, state jurisdictional statutes were deemed to regulate the business of insurance and were found to reverse-preempt non-bankruptcy federal jurisdictional statutes. E.g., *Munich* (reverse-preempted Federal Arbitration Act), *Davister* (reverse-preempted Federal Arbitration Act), *U.S. Financial Corp.* (reverse-preempted diversity jurisdiction), *Corcoran* (reverse-preempted diversity jurisdiction), *Covington* (reverse-preempted diversity jurisdiction).

In two recent cases, bankruptcy courts have held that jurisdiction under the Bankruptcy Code to determine whether the debtor or insolvent insurer owned a particular asset was reverse-preempted by the McCarran–Ferguson Act: *Advanced Cellular Systems, Inc. v. Mayol (In re Advanced Cellular Systems)*, 235 B.R. 713 (Bankr.D.P.R.1999) and *Wagner v. Amwest Ins. Group (In re Amwest Ins. Group)*, 285 B.R. 447 (Bankr.C.D.Cal. 2002). In *Advanced Cellular*, the bankruptcy court held that the McCarran–Ferguson Act reverse-preempted the bankruptcy court from deciding whether the debtor or the insurance company had property rights in a certificate of deposit. The Court found that the comprehensive Puerto Rico liquidation scheme for insurers, which gave the state liquidator jurisdiction over everything related to the insolvent insurance company and provided that "no act at law shall be brought against the insurer or the liquidator," was designed to regulate the business of insurance for the same reasons asserted in *Munich* and *Davister, supra*. *Advanced Cellular*, 235 B.R. at 723–24.

Similarly, in the very recent case, *Wagner v. Amwest Ins. Group, Inc. (In re Amwest Ins. Group, Inc.)*, 285 B.R. 447 (Bankr.C.D.Cal.2002), the bankruptcy court found that a comprehensive insurance act requiring registration and appraisal of tax allocation agreements between an insurer and its affiliates was designed to protect policyholders and regulate the business of insurance. As in *Advanced Cellular*, the debtor and the insurance company liquidator in *Amwest* claimed rights to the same assets—the tax refund controlled by the tax allocation agreement, which refund was in the possession of the debtor. In a declaratory judgment action challenging the bankruptcy court's jurisdiction, the Court held that the McCarran–Ferguson Act reverse-

preempted the bankruptcy court from interpreting the agreement to determine ownership. *Id.* at 455.

Clearly, in this case, Tennessee's comprehensive Insurers Rehabilitation and Liquidation Act, T.C.A. § 56–9–101, et seq., and those portions of the Act implicated here, are designed to "regulate the business of insurance" as defined by *Fabe* and the cases following it.[7] As in almost all of the above cases, the Act grants exclusive jurisdiction for cases arising under it to the Chancery Court of Davidson County, where a failing or insolvent insurer's assets can be marshaled, supervised, and protected from wasteful litigation in many forums through an orderly and uniform liquidation process. T.C.A. § 56–9–104(e). As in many of the cases above, the Act provides further that after an order of liquidation, "no action at law or equity or in arbitration shall be brought against the insurer or liquidator ... nor shall any such existing actions be maintained or further presented ...." T.C.A. § 56–9–313(a)(1).

As illustrated further in other provisions implicated here, this exclusive jurisdictional grant to one court is designed to protect policyholders and their agreements for risk transfer through the provision of a uniform process. The Chancery Court of Davidson County alone may issue orders for liquidation and seizure of assets such as those issued by the Chancery Court against the respondents, TCCN, MCMC, and AHS (T.C.A. § 56–9–201). The Chancery Court of Davidson County alone (T.C.A. § 56–9–104(e)) may issue orders requiring the cooperation of closely affiliated or managing entities such as MCMC or AHS in the liquidation process (T.C.A. § 56–9–106); and orders allowing the liquidator to avoid fraudulent and/or preferential transfers as alleged in the Commissioner's Petition to Recover (T.C.A. §§ 56–9–315 and 317). The inescapable conclusion from these provisions is that Tennessee's Insurers Rehabilitation and Liquidation Act, as a whole and its specific provisions implicated here, is aimed at protecting the relationship between policyholders and insurers and safeguarding their risk shifting agreements. This purpose is accomplished through the grant of exclusive jurisdiction to the Chancery Court of Davidson County to enter orders of liquidation, seizure, and all other orders necessary to marshal and distribute assets of failed insurance companies.

The Commissioner's motion in this Court seeks the resolution of the dispute between the insurer's liquidator and MCMC and AHS in the one forum specifically designed to protect the policyholder (in this case the TennCare Bureau) and its risk transfer agreement through the orderly liquidation process established by the Tennessee legislature. Therefore, the provisions of T.C.A. § 56–9–101, et seq., are designed to regulate the business of insurance as envisioned under the McCarran–Ferguson Act.

**b. Proceeding in the Bankruptcy Case Would Operate to "Invalidate, Impair or Supercede" the Tennessee Statutes Designed to Regulate the Business of Insurance**

■ The Court has found that Tennessee's Insurers Rehabilitation and Liqui-

---

**7.** Tennessee's Act itself defines the general purpose of the chapter as "the protection of the interests of insureds, claimants, creditors and the public generally." T.C.A. § 56–9–101(d). This purpose is accomplished by "[p]roviding for a comprehensive scheme for the rehabilitation and liquidation of insurance companies and those subject to this chapter as part of the regulation of the business of insurance, insurance industry and insurers in this state ....[and such] are deemed an integral aspect of the business of insurance and are of vital public interest and concern." T.C.A. § 56–9–101(d)(7).

dation Act as a whole embodies the requisite intent to regulate the business of insurance. Moreover, specific sections of the Act, which further that purpose, are implicated here. Such provisions include the granting of exclusive jurisdiction to the Chancery Court of Davidson County, the prohibition of suits against the insurer or liquidator once liquidation has begun, and the setting forth of procedures for avoiding preferences and fraudulent transfers. The Court must now decide whether the operation of the Bankruptcy Code through the automatic stay or through an inevitable declaratory judgment action or other proceeding would "invalidate, impair, or supercede" these state processes.

Whether by force of the current stay or by this Court's decision as to the alleged transfer and ownership of the funds, those portions of the Insurers Rehabilitation and Liquidation Act giving the Chancery Court of Davidson County exclusive jurisdiction over all actions under the Act would be invalidated, impaired, or superceded under the McCarran–Ferguson Act. The simple exercise of this Court's jurisdiction to decide whether the alleged transfer was valid and who owns the disputed funds or to preclude the Chancery Court from deciding these issues, without more, impinges upon and negates the obvious intent of the state legislature to consolidate all liquidation proceedings in one special court for the reasons stated previously. Moreover, if a case involves a violation of a supervisor's orders under the Act, such as those entered here for preapproval of disbursements, a liquidator may be required to pursue his claim of ownership in another, sometimes distant forum, having no acquaintance with the Act or the ongoing liquidation and the orders entered therein.

In the cases discussed above where state statutes grant exclusive jurisdiction over insurers' rehabilitation or liquidation proceedings, courts have found that the exercise of jurisdiction by federal authorities or courts, including bankruptcy courts, impedes or supercedes the state processes regulating the business of insurance. E.g., *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 595 (Oklahoma's insurance liquidation statute, which vests jurisdiction exclusively in one Oklahoma court, impaired by enforcement of Federal Arbitration Act); *Covington v. Sun Life of Canada (U.S.) Holdings, Inc.*, 2000 WL 33964592, 2000 U.S. Dist. Lexis 20902 (state statute giving exclusive jurisdiction to state court impaired by removal and the exercise of diversity jurisdiction); *Davister Corp. v. United Republic Life Ins. Co.*, 152 F.3d 1277, 1281 (Utah's insurance liquidation statute granting exclusive jurisdiction to state court over insurer's liquidation impaired by enforcement of Federal Arbitration Act); *Advanced Cellular Systems, Inc. v. Mayol*, 235 B.R. 713, 724–25 (turnover action in bankruptcy court impaired or impeded grant of exclusive jurisdiction over insurance liquidation to state court).

Accordingly, the operation of the Bankruptcy Code, whether by continuing the automatic stay or by entertaining an inevitable action to determine whether a valid transfer occurred and ownership of the disputed funds, "invalidates, impairs or supercedes" the grant of exclusive jurisdiction to the Chancery Court of Davidson County under the Insurers Rehabilitation and Liquidation Act. The stay should, therefore, be lifted for cause because the McCarran–Ferguson Act reverse-preempts the Bankruptcy Code in this instance.

2. ***Even if the McCarran–Ferguson Act Does Not Apply, Stay Relief Should be Granted***

 Certainly, if application of the Bankruptcy Code and this Court's jurisdic-

tion over the $5.7 million account is reverse-preempted by the McCarran–Ferguson Act, there is no doubt that cause exists for lifting the automatic stay to allow the Chancery Court of Davidson County to proceed with hearings on the pending Petition to Recover. However, even if the McCarran–Ferguson Act does not reverse-preempt the provisions of the Tennessee Insurers Rehabilitation and Liquidation Act and the Chancery Court's exclusive jurisdiction over disputes under that Act, the policies behind the McCarran–Ferguson Act support this Court's exercise of its discretion to lift the automatic stay for cause.[8]

■ That cause for lifting the stay may be presented by comity concerns, much like those underlying permissive abstention,[9] has again been recognized in the divorce context. In *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342 (4th Cir. 1992), the Fourth Circuit enumerated several factors for consideration in deciding whether the bankruptcy court abused its discretion in lifting the stay to permit a North Carolina court to divide the marital property between a debtor and his wife. Those factors included: "(1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if

the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the state can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." *Id.* at 345. Applying these factors to the division of marital assets, the court noted first that " '[t]he whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States' " *Id.* at 345–346 (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979)). Further, the ownership of marital property, involves " 'an inquiry into factors regularly considered by state courts in divorce proceedings, an inquiry which I would find best left to the state courts.' " *Id.* at 346 (quoting *In re Heslar*, 16 B.R. 329, 333 (Bankr. W.D.Mich.1981)). *Accord Donald v. Donald (In re Donald)*, 755 F.2d 715, 717 (9th Cir.1985) (quoting *In re Graham*, 14 B.R. 246, 248 (Bankr.W.D.Ky.1981)) ("It is appropriate for bankruptcy courts to avoid incursions into family law matters [including property distribution] 'out of consideration of court economy, judicial restraint, and deference to our state court brethren and their established expertise in such matters' ").

While there is currently no proceeding from which this Court may abstain, similar

---

**8.** In *Koken v. Reliance Ins. Co. (In re Reliance Group Holdings, Inc.)*, 273 B.R. 374 (Bankr. E.D.Pa.2002), the bankruptcy court addressed the insurance commissioner's state court action to establish a constructive trust upon cash that the insurance company paid to the debtor under a tax allocation agreement. The court noted that this matter, which had been removed to the bankruptcy court for the resolution of the dispute, would involve construction and interpretation of the Pennsylvania Insurance Holding Company Act, part of Pennsylvania's comprehensive insurance regulatory scheme. While noting that Congress

had recognized the long-standing state interest in regulating insurance by enacting the McCarran–Ferguson Act, the court did not analyze the factors required for reverse-preemption under that statute. Rather, the McCarran–Ferguson Act was used as an indicator of the serious state concerns supporting discretionary abstention. *Id.* at 399–401.

**9.** *See* discussion *infra* of permissive abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

deference to state processes has been articulated under 28 U.S.C. § 1334(c)(1) under the *Burford* doctrine for permissive abstention (*Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424). This is particularly true where the case presents formidable questions of state law that bear on policy problems of substantial public significance and whose importance transcends the result in the case at bar, or where adjudication in federal court would disrupt or interfere with state efforts to establish a coherent policy over a matter of substantial public (state) concern. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726–27, 116 S.Ct. 1712, 1726, 135 L.Ed.2d 1 (1996). The Petition to Recover in the Chancery Court is equitable in nature and there can be no doubt that Tennessee, like many states, has sought through its comprehensive insurance regulatory scheme to establish a coherent scheme of insurance regulation. As discussed earlier, the states' interest in regulating insurance has long been deemed a state rather than federal interest, even before Congress codified that interest in the McCarran–Ferguson Act.

In addition to these notions of comity, which support a finding of cause for lifting the stay or for abstention in an appropriate case, as in *Robbins,* 964 F.2d at 347, the Chancery Court of Davidson County has already entertained many matters relating to this liquidation and the disputed account. The Chancellor has been well-versed in the tortuous history of TCCN under the orders of supervision and liquidation already entered. Not only would this Court be required to interpret and apply certain portions of state insurance law, which the Chancery Court of Davidson County has done on numerous occasions, it would also be required to interpret the orders of supervision, liquidation, and seizure entered by the Supervisor and the Chancery Court pursuant to Tennessee's statutory scheme. Litigation of these matters in Chancery Court of Davidson County would therefore promote judicial economy.

Finally, contrary to the contentions of the debtors and the unsecured creditors committees, litigation of the Petition to Recover now pending in the Chancery Court would not harm the estate or the interest of other creditors. Who owns these funds and whether the alleged transfer into MCMC's account was valid must be determined by applying applicable state law. While individual creditors may not appear in Chancery Court, the trustees for MCMC and AHS can more than adequately represent their interests across town, just as the trustees would carry the burden in any proceeding in this Court. Should the Chancery Court find that the disputed account belongs to the debtors, that account will be distributed here under the Bankruptcy Code. Should the Chancery Court award damages rather than determine ownership of the frozen assets as is requested by the Commissioner in her Petition to Recover, any collection proceeding against MCMC or AHS must proceed here as a claim against the debtors' estates.

Accordingly, even if the McCarran–Ferguson Act does not reverse-preempt this Court's jurisdiction over the cause of action asserted in the Petition to Recover, several factors weigh in favor of lifting the stay: (1) there are clearly strong state policy interests presented since Tennessee has established an orderly scheme for the rehabilitation and liquidation of insurance companies, the regulation of which has long been recognized by both the states and the federal government as one having primarily state policy implications, (2) these policy and comity considerations are at least as strong, if not stronger, than those in the divorce context, (3) consider-

ations of judicial economy weigh in favor of litigating the Petition to Recover in the Chancery Court, and (4) there is an apparent absence of harm to the estate if the Chancery Court is permitted to proceed on the Petition to Recover. All of these factors support this Court's finding that under 11 U.S.C. § 362, the stay should be lifted for cause, to allow the prosecution and resolution of the Petition to Recover in the Chancery Court of Davidson County to determine which entity owns the funds now held by AmSouth Bank.

## IV. CONCLUSION

In light of the findings and conclusions herein, it is unnecessary to address the Commissioner's remaining arguments. The Court finds that the automatic stay should be lifted for cause under 11 U.S.C. § 362, to allow the prosecution and resolution of the Petition to Recover currently pending in the Chancery Court of Davidson County. An order in conformity with this Memorandum Opinion will be entered lifting the stay for this purpose. In all other respects the stay will remain in effect.

This Memorandum Opinion will be entered in duplicate in the following cases: Case No. 301–14089 and Case No. 301–14090.